OPINION
{¶ 1} Defendant-appellant Courtney Buford appeals from his conviction on two counts of Aggravated Robbery, two counts of Felonious Assault, one count of Theft of Drugs, and two counts of Aggravated Burglary. All the counts except the Theft of Drugs count carried firearm specifications. Buford pled no contest to the charges after his *Page 2 
motion to suppress was denied, and he was sentenced to various concurrent sentences, for a total of nine years in prison.
 {¶ 2} Buford contends that the trial court correctly found that campus security officers employed at a hospital are "state actors," and are therefore bound by the Fourteenth Amendment prohibition against unreasonable searches and seizures. However, Buford contends that the trial court erred in holding that the security officers had a reasonable and articulable suspicion for a stop and detention while Buford was in the hospital parking lot. Additionally, Buford contends that he was arrested and that the officer lacked probable cause for the arrest.
 {¶ 3} We conclude that the trial court did not err in denying the motion to suppress. The hospital security officers were not "state actors." Therefore, their actions do not implicate the Fourth Amendment, and do not support suppression of the evidence. Accordingly, the judgment of the trial court is Affirmed.
 I {¶ 4} On November 26, 2006, Ira Browning was a campus police officer employed by Good Samaritan Hospital (GSH). Browning's sergeant, Bruce Jackson, called Browning around 10:00 p.m., and asked him to come to the hospital parking lot to help with a gunshot victim. When Browning arrived at the lot, Jackson was attending to the victim, who was later identified as Daniel Grimes. Grimes was on the ground, on the passenger side of a white Nissan Maxima, and appeared to have an injury to his stomach. When Browning arrived, Grimes was attempting to get up. Jackson informed Browning that Grimes had come out of the car. *Page 3 
 {¶ 5} At that point, the driver of the car (later identified as Courtney Buford), was attempting to drive away. Browning ordered Buford to shut off the car, to place his keys on the dash, and to exit the car. Browning also told Buford to walk backwards toward him after he exited. Buford complied with these instructions. Browning then patted Buford down and asked if he had anything that Browning needed to know about for officer safety. When Buford hesitated, Browning asked if Buford had a gun, and Buford said yes. Buford stated that the gun was in the car. At that point, Browning asked another hospital officer to handcuff Buford for officer safety. Browning also did not know if Buford was the person who had shot Grimes or if Buford was a victim as well.
 {¶ 6} When Browning looked into the car, he was able to see a handgun stuck between the driver's seat and the console. Browning reached into the car and pulled out the handgun. After removing the magazine from the gun, Browning secured the gun on his person. At that time, no Dayton police officers had arrived at the scene.
 {¶ 7} Lieutenant Lane of the GSH campus police also responded to the scene in the parking lot. When Lane arrived, Grimes was lying on the ground and was being attended to by medical personnel. Buford was in handcuffs at the rear of the Nissan. Lane asked Buford what had happened and Buford said that he had been shot. Lane noticed that Buford had blood at the back of his hand, and asked the staff if they wanted to have Buford evaluated in the emergency room. After receiving a positive response, Lane escorted Buford into emergency bed two. Because a gun had been located in the car, Lane asked Buford if he had any other weapons. Buford said that he did not have any weapons but that Lane could check.
 {¶ 8} While checking for weapons, Lane felt a rectangular metal object in *Page 4 
Buford's front pocket. Buford said it was a cell phone, but Lane reached in to remove the object anyway, because he was aware of a .22 caliber weapon on the market that is also a cell phone. When Lane removed the cell phone, a baggie containing a white rock-like substance also came out of the pocket. Lane suspected that the baggie contained crack cocaine and decided to find out what else was in Buford's pocket. Lane then removed another baggie with a white rock-like substance, a green leafy substance, and a scale. Again, no one from the Dayton Police Department was there at the time.
 {¶ 9} The GSH campus police are paid by the hospital, not by the City of Dayton. They wear a uniform which bears insignia stating "Good Samaritan Hospital Police" and "Special Dayton Police, State of Ohio." These officers are licensed through the City of Dayton, are permitted to carry a weapon, and have arrest powers on hospital property. If the officers arrest individuals on hospital property, the arrest is made pursuant to the Ohio Revised Code. The officers may question people and give Miranda warnings. However, they do not have authority to investigate crimes that do not happen on GSH property, nor may they investigate shootings that occur off-campus. The officers are there for the security and safety of hospital staff and to secure individuals pending arrival of the Dayton Police Department.
 {¶ 10} Officer Jones of the Dayton Police Department was dispatched to GSH around 10:00 p.m. on a report of a shooting victim who had just arrived in the emergency room. When Jones arrived, GSH security officers told him that two people had been shot. Jones then went inside the emergency room and spoke with Buford. Jones did not administer Miranda rights at that time because Buford was not a suspect. At that point, Jones considered Buford a victim. Buford stated that he and his cousin *Page 5 
had gone to a pharmacy, when two males approached their car and started firing. Buford then "pulled off." When Jones asked about the gun, Buford said something about the gun hitting the door and falling inside the vehicle as he pulled off. About an hour and a half later, while still at the scene, Jones learned that Buford was a suspect, not a victim. Jones indicated that Buford was not under arrest, nor was he handcuffed when they spoke.
 {¶ 11} Officer Jones also spoke to one of the GSH security officers about a gun. The officer said he had discovered a gun inside the car. After learning precisely where the gun had been found, Jones placed the gun back in the car so that it could be photographed by the evidence crew. The car was eventually towed pursuant to the Dayton Police Department's towing policy, since the driver was going to be placed under arrest.
 {¶ 12} Dayton Police Officer Elholz was dispatched that evening to 2321 Rustic on a report of a shooting and aggravated robbery. When Elholz arrived at the Rustic address, he was told to go to GSH, where he made contact with Dayton Police Detective Daryl Smith. From there, Elholz went to a treatment room and spoke with one of the alleged victims, Darin Culpepper. Elholz then spoke with Buford. Before speaking with Buford, Elholz administered Miranda warnings. Buford indicated he understood his rights and agreed to speak with Elholz. The following day, Detective Billinski of the Dayton Police Department also interviewed Buford, again after administering Miranda warnings. Buford then gave an oral confession to Billinski.
 {¶ 13} Subsequently, Elholz prepared separate photo spreads for both Buford and Grimes, and showed the spreads to Culpepper. Culpepper positively identified *Page 6 
Buford immediately, but did not identify Grimes. Several days after the shooting, Elholz spoke with the owner of the Nissan, a Mrs. Hurd, who consented to a search of the car.
 {¶ 14} Buford was indicted on two counts of Aggravated Robbery, two counts of Felonious Assault, and two counts of Aggravated Burglary, all with gun specifications, and on one count of Theft of Drugs. Buford filed a motion to suppress all evidence seized during an alleged illegal and warrantless search, all statements made by Buford, all photo identification, and all in-court identification. Following a hearing, the trial court overruled the motion to suppress. The court first assumed that the officers were "state actors" for purposes of the Fourth and Fourteenth amendments. The court then concluded that the GSH security officers acted reasonably in briefly detaining Buford to determine the circumstances surrounding Grimes's arrival at the hospital parking lot. The court further concluded that the officers had a reasonable and articulable suspicion that criminal activity had been engaged in before Buford arrived at the hospital parking lot. The trial court made other findings as to the voluntariness of Buford's waiver of rights and the admissibility of photographic evidence, but these matters have not been raised on appeal.
 {¶ 15} After the court's decision on suppression, Buford pled no contest, was found guilty, and was sentenced accordingly. Buford appeals from his conviction and sentence.
 II {¶ 16} Buford's First Assignment of Error is as follows:
 {¶ 17} "THE TRIAL COURT ERRED AND VIOLATED THE FOURTH *Page 7 
AMENDMENT WHEN IT DENIED APPELLANT'S SUPPRESSION MOTION."
 {¶ 18} Under this assignment of error, Buford contends that the trial court erred in finding that the security officers' actions were permissible. Buford claims that instead of treating him as a "good Samaritan" who was bringing an injured person for treatment, Officer Browning immediately ordered him from the car and searched him. Buford also contends that Browning arrested him without probable cause by placing him in handcuffs. In response, the State argues that the trial court erred in concluding that the GSH officers were "state actors." The State additionally contends that Browning had reasonable suspicion to detain and to handcuff Buford for a short time while officers looked for a weapon.
 {¶ 19} In ruling on motions to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." State v. Retherford (1994), 93 Ohio App.3d 586, 592,639 N.E.2d 498. Accordingly, when we review suppression decisions, "we are bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." Id.
 {¶ 20} For purposes of its analysis, the trial court assumed that the GSH security officers were "state actors" for purposes of the Fourth Amendment. We conclude that they were not state actors for these purposes. We have previously held that the conduct of security officers employed by a privately owned hospital is not considered "state action" under the Fourth Amendment, even though the officers are publicly *Page 8 
commissioned. State v. Chung (Feb. 19, 1999), Montgomery App. No. 17154,1999 WL 76945, * 3. In Chung, we stressed that:
 {¶ 21} "The Fourth Amendment limits official government behavior, it does not regulate private conduct. Courts have regularly declined to exclude evidence when it is obtained by private persons. * * * The unlawful acts of private individuals in conducting illegal searches and seizures are not subject to constitutional proscription." Id. at * 2 (citations omitted).
 {¶ 22} Because we conclude that the hospital security officers were not state actors for Fourth Amendment purposes, it follows that nothing they did implicates the Fourth Amendment, as applied to the states by the Fourteenth Amendment, and therefore nothing they did can serve as a basis to suppress the evidence obtained as a result of what they did. Therefore, the trial court did not err in denying Buford's motion to suppress.
 {¶ 23} The first time that a City of Dayton police officer spoke to Buford was during Buford's treatment in emergency room two. While this officer (Jones) did not administer Miranda warnings, Jones's unrebutted testimony was that he was simply doing preliminary investigation to find out what had happened. Jones stated that he did not consider Buford a suspect when they spoke and he also indicated that Buford was not handcuffed at the time. Jones learned about an hour and a half later that Buford was a suspect in the shooting. Since Buford was not "in custody," Jones was not required to administer warnings. See, e.g.,State v. Mason, 82 Ohio St.3d 144, 153, 694 N.E.2d 932, 946 (stating that "[o]nly a custodial interrogation triggers the need for a Miranda rights warning"). *Page 9 
 {¶ 24} Dayton police officer Elholz and Dayton police detective Billinski did give Buford Miranda warnings on two subsequent occasions, at times when Buford was considered a suspect. On both occasions, Buford waived his rights and spoke with the officers. There is no indication in the record that Buford's consent was involuntary. Finally, the police did not search the car for several days, until after the owner had given consent.
 {¶ 25} In view of the above facts, we conclude that Buford's rights under the Fourth Amendment were not violated. In addition, there is no indication in the record that Buford failed to knowingly and voluntarily waive his Miranda rights or that his confession was involuntary. CompareState v. Sapp, Clark App. No. 99 CA 84, 2002-Ohio-159, at ¶ 49 (noting that "[w]hether a confession is voluntary depends upon `the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.'") (citation omitted). The trial court found no evidence to suggest that Buford failed to voluntarily waive his rights or that Buford was coerced into making a statement. Buford has not specifically challenged these findings on appeal, other than to suggest that all the evidence is tainted as "fruit of the poisonous tree."
 {¶ 26} "To determine whether evidence is excludable fruit of the poisonous tree, the proper question to ask is whether the evidence was obtained by exploitation of an illegal frisk or instead by means sufficiently distinguishable to be purged of the primary taint."State v. Warren (1998), 129 Ohio App.3d 598, 606, 718 N.E.2d 936. Since no "primary taint" exists in the present case, this doctrine does not apply. *Page 10 
 {¶ 27} Buford's sole assignment of error is overruled.
 III {¶ 28} Buford's sole assignment of error having been overruled, the judgment of the trial court is Affirmed.
WOLFF, P.J., and GRADY, J., concur.
Copies mailed to:
 Hon. Michael Tucker *Page 1