OPINION
{¶ 1} Daniel Grimes, defendant-appellant, appeals from his conviction in the Montgomery County Common Pleas Court of two counts of aggravated robbery, two *Page 2 
counts of aggravated burglary, two counts of felonious assault, and one count of theft of drugs. Grimes contends the trial court erred in denying his motion to suppress evidence gathered by the police in violation of his Fourth Amendment rights.
 {¶ 2} The facts underlying this appeal are set out in the companion case of State v. Buford, Montgomery App. No. 22149, 2008-Ohio-2231, decided May 9, 2008, and are as follows:
 {¶ 3} On November 26, 2006, Ira Browning was a campus police officer employed by Good Samaritan Hospital (GSH). Browning's sergeant, Bruce Jackson, called Browning around 10:00 p.m., and asked him to come to the hospital parking lot to help with a gunshot victim. When Browning arrived at the lot, Jackson was attending to the victim, who was later identified as Daniel Grimes. Grimes was on the ground, on the passenger side of a white Nissan Maxima, and appeared to have an injury to his stomach. When Browning arrived, Grimes was attempting to get up. Jackson informed Browning that Grimes had come out of the car.
 {¶ 4} At that point, the driver of the car (later identified as Courtney Buford), was attempting to drive away. Browning ordered Buford to shut off the car, to place his keys on the dash, and to exit the car. Browning also told Buford to walk backwards toward him after he exited. Buford complied with these instructions. Browning then patted Buford down and asked if he had anything that Browning needed to know about for officer safety. When Buford hesitated, Browning asked if Buford had a gun, and Buford said yes. Buford stated that the gun was in the car. At that point, Browning asked another hospital officer to handcuff Buford for officer safety. Browning also did not know if Buford was the person who had shot Grimes or if Buford was a victim as well. *Page 3 
 {¶ 5} When Browning looked into the car, he was able to see a handgun stuck between the driver's seat and the console. Browning reached into the car and pulled out the handgun. After removing the magazine from the gun, Browning secured the gun on his person. At that time, no Dayton police officers had arrived at the scene.
 {¶ 6} Lieutenant Lane of the GSH campus police also responded to the scene in the parking lot. When Lane arrived, Grimes was lying on the ground and was being attended to by medical personnel. Buford was in handcuffs at the rear of the Nissan. Lane asked Buford what had happened and Buford said that he had been shot. Lane noticed that Buford had blood at the back of his hand, and asked the staff if they wanted to have Buford evaluated in the emergency room. After receiving a positive response, Lane escorted Buford into emergency bed two. Because a gun had been located in the car, Lane asked Buford if he had any other weapons. Buford said that he did not have any weapons but that Lane could check.
 {¶ 7} While checking for weapons, Lane felt a rectangular metal object in Buford's front pocket. Buford said it was a cell phone, but Lane reached in to remove the object anyway, because he was aware of a .22 caliber weapon on the market that is also a cell phone. When Lane removed the cell phone, a baggie containing a white rock-like substance also came out of the pocket. Lane suspected that the baggie contained crack cocaine and decided to find out what else was in Buford's pocket. Lane then removed another baggie with a white rock-like substance, a green leafy substance, and a scale. Again, no one from the Dayton Police Department was there at the time.
 {¶ 8} The GSH campus police are paid by the hospital, not by the City of Dayton. They wear a uniform which bears insignia stating "Good Samaritan Hospital Police" and "Special Dayton Police, State of Ohio." These officers are licensed through *Page 4 
the City of Dayton, are permitted to carry a weapon, and have arrest powers on hospital property. If the officers arrest individuals on hospital property, the arrest is made pursuant to the Ohio Revised Code. The officers may question people and give Miranda warnings. However, they do not have authority to investigate crimes that do not happen on GSH property, nor may they investigate shootings that occur off-campus. The officers are there for the security and safety of hospital staff and to secure individuals pending arrival of the Dayton Police Department.
 {¶ 9} Officer William Jones Jr. of the Dayton Police Department was dispatched to GSH around 10:00 p.m. on a report of a shooting victim who had just arrived in the emergency room. When Jones arrived, GSH security officers told him that two people had been shot. Jones then went inside the emergency room and spoke with Buford. Jones did not administer Miranda rights at that time because Buford was not a suspect. At that point, Jones considered Buford a victim. Buford stated that he and his cousin had gone to a pharmacy, when two males approached their car and started firing. Buford then "pulled off." When Jones asked about the gun, Buford said something about the gun hitting the door and falling inside the vehicle as he pulled off. About an hour and a half later, while still at the scene, Jones learned that Buford was a suspect, not a victim. Jones indicated that Buford was not under arrest, nor was he handcuffed when they spoke.
 {¶ 10} Officer Jones also spoke to one of the GSH security officers about a gun. The officer said he had discovered a gun inside the car. After learning precisely where the gun had been found, Jones placed the gun back in the car so that it could be photographed by the evidence crew. The car was eventually towed pursuant to the Dayton Police Department's towing policy, since the driver was going to be placed under *Page 5 
arrest. An emergency room nurse gave Jones Grimes' personal effects which she removed while treating him.
 {¶ 11} Dayton Police Officer Elholz was dispatched that evening to 2321 Rustic on a report of a shooting and aggravated robbery. When Elholz arrived at the Rustic address, he was told to go to GSH, where he made contact with Dayton Police Detective Daryl Smith. From there, Elholz went to a treatment room and spoke with one of the alleged victims, Darin Culpepper. Elholz then spoke with Buford. Before speaking with Buford, Elholz administered Miranda warnings. Buford indicated he understood his rights and agreed to speak with Elholz. The following day, Detective Bilinski of the Dayton Police Department also interviewed Buford, again after administering Miranda warnings. Buford then gave an oral confession to Bilinski.
 {¶ 12} Subsequently, Elholz prepared separate photo spreads for both Buford and Grimes, and showed the spreads to Culpepper. Culpepper positively identified Buford immediately, but did not identify Grimes. Several days after the shooting, Elholz spoke with the owner of the Nissan, a Mrs. Hurd, who consented to a search of the car. It is not clear from the record whether any evidence was recovered during the search of the vehicle after Mrs. Hurd consented to the search.
 {¶ 13} Later that night, Grimes was transported to Miami Valley Hospital for surgery. This is where Detective Timothy Bilinski of the Dayton Police Department found him. Detective Bilinski had been assigned to investigate a shooting and had developed Grimes as a suspect. Before questioning Grimes, Bilinski read him his Miranda rights. He then read Grimes a waiver statement and asked him if he would be willing to give up those rights and answer some questions. Grimes agreed. Grimes denied being in the vehicle Buford was seen driving before Buford was arrested. *Page 6 
According to Detective Bilinski, it was not until he put pointed questions to him about the shooting that Grimes said he might not be thinking clearly and asked to see an attorney. Bilinski ceased his questioning and noted that Grimes did not ask him to stop or otherwise indicate that he was having difficulty understanding or responding until then. Bilinski observed that he did not slur his speech or appear in any way to be impaired. In light of his experience, he believed that Grimes was capable of understanding and responding to his questions.
 {¶ 14} Ultimately, Grimes was charged with several crimes related to the shooting that Detective Bilinski was investigating. It is not clear from this record what evidence police recovered which implicated Grimes in the crimes for which he was charged. After the trial court denied his motion to suppress, he pled no contest to each count and was sentenced to prison.
 {¶ 15} In a single assignment, Grimes contends the trial court erred in denying his suppression motion. First, he contends the police violated his rights by searching his personal effects which were turned over to them by the nurse at the Good Samaritan Hospital. There was no evidence presented at the suppression hearing that anything incriminating was found in his personal effects. If police violated rights protected under the Health Insurance Portability and Accountability Act ("HIPPA"), Grimes has failed to cite any authority that such a violation requires suppression of the information in a criminal prosecution. Grimes also contends his statements to Detective Bilinski should be suppressed because they were a product of an illegal arrest. There is no evidence Grimes was under arrest when he spoke to Bilinski at the hospital. Grimes also contends the State failed to prove that he knowingly and intelligently waived his Miranda rights.Miranda, however, only applies to in-custody interrogations. Miranda v.Arizona, *Page 7 384 U.S. 436 (1966). Grimes contends the police improperly searched the vehicle in which he was a passenger and recovered a gun. The search was conducted by Good Samaritan Hospital security. The Fourth Amendment has no application to private conduct. Burdeau v. McDowell (1921),256 U.S. 465. The Appellant's assignment of error is Overruled.
 {¶ 16} The Judgment of the trial court is Affirmed.
 GRADY, J., and DONOVAN, J., concur. *Page 1