[Cite as *State v. Davis*, 2017-Ohio-5613.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO. 27202 |
| | : | |
| v. | : | T.C. NO. 15-CR-3419/1 |
| | : | |
| BARBARA DAVIS | : | (Criminal Appeal from |
| | : |  Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

**O P I N I O N**

Rendered on the ___30th___ day of _____June_____, 2017.

. . . . . . . . . . .

HEATHER N. JANS, Atty. Reg. No. 0084470, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
　　　Attorney for Plaintiff-Appellee

CARLO C. McGINNIS, Atty. Reg. No. 0019540, 55 Park Avenue, Dayton, Ohio 45419
　　　Attorney for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} After the trial court denied her motion to suppress, Barbara Davis pled no contest in the Montgomery County Court of Common Pleas to possession of cocaine (greater than 27 grams, but less than 100 grams), a felony of the first degree. The trial court sentenced her to a mandatory term of three years in prison and suspended her driver's license for six months. Davis appeals from her conviction, claiming that the trial

court erred in denying her motion to suppress.

{¶ 2} For the following reasons, the trial court's judgment will be reversed, and the case will be remanded for further proceedings.

## I. Background and Procedural History

{¶ 3} In ruling on a motion to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994); *State v. Knisley*, 2d Dist. Montgomery No. 22897, 2010-Ohio-116, ¶ 30. Accordingly, when we review suppression decisions, we must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Retherford* at 592. "Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*

{¶ 4} The trial court heard evidence on the suppression motion on January 21 and March 3, 2016. The evidence primarily consisted of the testimony of four Dayton police officers: Officer Terry Perdue, Officer Jeff Hieber, Officer Jennifer Stack, and Detective Sean Humphrey. Officer Perdue testified on both hearing dates. His testimony on January 21 was based on his recollection of the events of November 6, 2016. On March 3, Perdue was questioned about his police report, which varied somewhat from his recollection of the chronology of the events. The trial court's factual findings are generally consistent with the police report and Perdue's March 3 testimony. The State's evidence, as credited by the trial court, established the following facts.

{¶ 5} At approximately 8:20 p.m. on November 6, 2015, Officers Perdue and

Hieber, in separate cruisers, responded to a call from Good Samaritan Hospital that an individual, later identified as Austyn DeLong, was being detained for possession of heroin. Upon their arrival, the officers went to the hospital security office and spoke with two hospital security officers, Officers Jason LaForce and Nick Wolfe. DeLong was detained in handcuffs when the Dayton police officers arrived. DeLong's companion, Davis, was not under arrest, but she was seated with her handbag in the hospital security office.

{¶ 6} Officers Perdue and Hieber walked DeLong to their cruisers, leaving Davis in the security office. On the way to the cruiser, after receiving *Miranda* warnings, DeLong told the officers that his companion had "all of the drugs on her," that the syringe on his person belonged to her, and that her name was "Barb." Officer Perdue placed DeLong in his cruiser, first removing a syringe that DeLong had in his waistband.

{¶ 7} Officer Perdue returned to the hospital and obtained "identifiers" from Officer LaForce for Davis; Davis had told the Good Samaritan Hospital officers that her name was Kelly Wood.[1] Davis was present when the Good Samaritan Hospital officers relayed to Officer Perdue that Davis's name was Kelly Wood; Davis did not tell anyone that the information was incorrect. Perdue ran the information he had been given through his cruiser's computer, and it returned to Kelly Wood. Because this name did not correspond to the one given by DeLong for Davis ("Barb"), Officer Perdue believed that Davis had "intentionally deceived the officers." Perdue decided to arrest Davis for "providing false identifying information."

---

[1] On January 21, Officer Perdue had testified that he obtained the identifiers for both DeLong and Davis before taking DeLong to a cruiser and that he intended to run both identifications when he went out to his cruiser. Perdue testified that, after DeLong implicated his companion, he "realized that Ms. Davis had given us false information." (*See, e.g.,* Suppression Tr. Vol. I at 8-9, 25.).

{¶ 8} Officer Perdue went back inside Good Samaritan Hospital, placed Davis in handcuffs, conducted a cursory pat down, and walked her out to his cruiser. (Perdue did not pat down Davis's chest area, and he did not find anything during his pat down.) An officer (it is unclear whether it was Perdue or a hospital officer) carried Davis's large, white handbag outside; the handbag did not have a zipper, and it was "wide open."

{¶ 9} Officer Hieber informed Davis of her *Miranda* rights using a card provided by the prosecutor's office. Davis indicated that she understood her rights and agreed to speak with the officers without an attorney. Hieber also called for a female officer to come to perform a "pat down" on Davis; Officer Stack responded.

{¶ 10} Prior to conducting the "pat down," Officer Stack asked Davis if she had anything that might hurt the officer. Davis responded that she had a needle in her bra. Stack asked if the needle was capped; Davis stated that she believed it was. Stack gently lifted Davis's bra out to see if the needle would fall out; it did not. Stack then gently patted down Davis's chest and located two syringes and a plastic baggie with ten heroin capsules in the left side of Davis's bra. Davis was placed inside a cruiser.

{¶ 11} While Davis was being searched, Officer Perdue placed Davis's handbag on one of the cruisers and observed a plume of white powder or dust shoot from the top. Perdue noticed that inside the bag, at the top, were two plastic grocery bags containing four open transparent baggies with a white powdery substance. Perdue testified that, from his training and experience, he recognized the substance as cocaine. Upon searching Davis's handbag, Perdue also saw a small scale; a Social Security card in Davis's name was located in a small make-up bag.

{¶ 12} Officer Perdue field-tested the powdery substance found in the handbag; it

tested positive for cocaine. Davis told the officers that the drugs belonged to DeLong. Officer Perdue placed the baggies into a biohazard bag and sealed it prior to transporting Davis to the jail.

{¶ 13} At approximately 7:54 a.m. on November 8, 2015, Detective Humphrey interviewed Davis at the Montgomery County Jail. The detective explained to her that he was the detective assigned to her case, and he asked her if she was willing to speak with him regarding to "the incident that went on." Davis indicated that she would. Humphrey then informed Davis of her *Miranda* rights using a pre-interview form. After reading her each right verbatim, Humphrey asked Davis if she understood. She indicated that she did by signing her initials next to each right. After reading her the waiver, Davis signed her name beneath a sentence stating that she had completed twelve years of schooling. Davis then spoke with the detective.

{¶ 14} On November 16, 2015, Davis was indicted for possession of drug abuse instruments, possession of heroin, aggravated possession of drugs, and possession of cocaine. She subsequently moved to suppress the evidence against her. Davis asserted that her statements were made in violation of her Fifth Amendment rights and that the evidence was seized as the product of an unconstitutional search.

{¶ 15} After hearings on two dates, the trial court overruled the motion to suppress. The trial court found that Davis had knowingly, intelligently, and voluntarily waived her *Miranda* rights, both on the evening of November 6 and the morning of November 8, 2016, and that her statements were admissible. With respect to the seized evidence, the court found that the searches of Davis and her handbag were lawful as searches incident to a lawful arrest. In reaching this conclusion, the trial court noted that it was "undisputed that

[Davis] was under arrest at the time that Off. Stack searched her body and Off. Perdue searched her canvas bag." The trial court did not specifically address whether the arrest was lawful, but stated in a different portion of its decision that "the officers already had probable cause to arrest Defendant for giving them false information regarding her identity." The trial court further found that the search of the handbag was permissible under the plain view doctrine. Finally, the trial court concluded that, even if no warrantless search exceptions applied, the fruit of the search of the bag would still be admissible under the inevitable discovery doctrine.

{¶ 16} The same day that her motion to suppress was denied, Davis pled no contest to possession of cocaine, a first-degree felony. In exchange for the plea, the State agreed to dismiss the remaining charges. The trial court accepted Davis's plea, and sentenced her accordingly.

{¶ 17} Davis appeals from her conviction, raising four assignments of error, all of which challenge the trial court's ruling on her motion to suppress. First, she claims that the trial court erred in failing to suppress the evidence that was seized, because the officers lacked probable cause to arrest her for obstructing official business or falsification. She argues that she identified herself to hospital security and did not make any false statements to the Dayton police officers. Davis further argues that the subsequent searches of her person and handbag were unconstitutional. Second, she claims that the trial court erred in failing to suppress her statements at the scene, because the State failed to demonstrate that she was provided her *Miranda* rights prior to making statements to the officers.

{¶ 18} The State responds that Davis did not challenge in the trial court whether

there was probable cause to arrest her; it thus asserts that Davis waived any challenge to the lawfulness of her arrest. The State further responds that the trial court properly found that the search of Davis and her handbag were proper (1) under the plain view doctrine, (2) as a search incident to her arrest, and (3) under the inevitable discovery rule, as the items would have been found during a search prior to her being booked into the jail. Finally, the State argues that Davis was properly given *Miranda* warnings, both at the scene of the arrest and later at the jail, and therefore her statements were admissible.

## II. Waiver of Issues for Appeal

{¶ 19} As a preliminary matter, the State claims that Davis waived any challenge to whether Officer Perdue had probable cause to arrest her, because she did not identify this as an issue for the trial court to address.

{¶ 20} Under Crim.R. 47, a motion, including a motion to suppress evidence, must "state with particularity the grounds upon which it is made and shall set forth the relief or order sought. It shall be supported by a memorandum containing citations of authority, and may also be supported by an affidavit."

{¶ 21} If a motion to suppress fails to state a particular basis for relief, that issue is waived and cannot be argued on appeal. *E.g.*, *State v. Cullins*, 2d Dist. Montgomery No. 23017, 2009-Ohio-6136, ¶ 10. As stated by the Supreme Court of Ohio with respect to a motion to suppress evidence obtained from warrantless search:

> The prosecutor must know the grounds of the challenge in order to prepare his case, and the court must know the grounds of the challenge in order to rule on evidentiary issues at the hearing and properly dispose of the merits. Therefore, the defendant must make clear the grounds upon

which he challenges the submission of evidence pursuant to a warrantless search or seizure. Failure on the part of the defendant to adequately raise the basis of his challenge constitutes a waiver of that issue on appeal.

(Internal citations omitted.) *Xenia v. Wallace*, 37 Ohio St.3d 216, 218, 524 N.E.2d 889 (1988).

{¶ 22} While Davis clearly raised the Fifth Amendment as the basis for her motion to suppress her statements, her motion to suppress the seized evidence simply stated that the seizure "was the product of a search conducted in violation of [her constitutional] rights." The motion raised no specific issues and was a general motion containing broad language. Davis did not provide a memorandum to support her motion. Upon review of the motion itself, we agree with the State that Davis should have described the bases for her motion with more detail.

{¶ 23} We also note that Davis had an opportunity to clarify the bases for her motion at the January 31 hearing, but did not. At the conclusion of Officer Perdue's testimony (the first witness), the trial court asked the prosecutor who else she intended to call and, specifically, if she intended to call the hospital's officers. The prosecutor responded:

No, Your Honor. The motion was pretty vague in terms of what facts or what consequences we're calling into question. I took the motion to mean the patdown of her person outside -- or the search of her bag and the *Miranda* issues that were read to her by Officer Hieber and by Detective Humphrey, who is also here.

(MTS Trans., Vol. I, at 40.) Defense counsel did not respond to the prosecutor's

statement.

{¶ 24} Nevertheless, the question of probable cause was repeatedly raised with Officer Perdue during cross-examination. On the first suppression hearing date, Perdue testified:

Q   Okay.   Now, when you arrived at Good Samaritan Hospital, were you accompanied by Officer Hieber at the same time?

A   He arrived very close to the time that I got there.

Q   And did you then first go to the Security office?

A   Correct.

Q   And were you accompanied by Officer Hieber?

A   At some point in the Security office Officer Hieber arrived on scene.

Q   Okay.   And when you arrived at the Security office, there [were] two Good Samaritan officers.   I think a Wolfe and a LaForce (phonetic throughout)?

A   Correct.

Q   And you testified that you were given identifiers for who you identified now as Barbara Davis but from one of the, either LaForce or Wolfe, correct?

A   Correct.

Q   That was not given to you directly by Ms. Davis.

A   Not until we got outside.

Q   Not at that initial time.

A   Correct.

Q   That information you obtained from the security officers.

A    Correct.

Q    Okay.  And so that search was based on what they gave you, the security officers.

THE COURT: What search?

Q    When you checked the information on her, Kelly Wood.

A    Correct.

Q    Okay. And when you ran the identifiers given to you by the security officers that came back Kelly Wood, was there a person listed as Kelly Wood?

A    Correct.

Q    And did you get a photo?

A    No.

Q    You didn't look at any photo of Kelly Wood.

A    No, sir.

Q    Okay. And do you recall the description of the person that was listed as Kelly Wood?

A    No, sir.

Q    Didn't make a note of that anywhere?

A    Once he told me her name was Barb, I went back to try to figure out who she was.

Q    So once a potential criminal suspect gave you a name, you wanted to go with that instead of what might show up in your checking of that person?

A    What --

Q   As the physical identifiers?

A   What's your question?

THE COURT: Well, he's calling into question your investigative techniques. He's doing it ever so nicely. But take no offense. Just he's asking a question. He wants to know rather than run with the computer, you were told by Mr. DeLong, who you suspected of a crime, you were told by Mr. DeLong that Kelly really wasn't Kelly. It was Barb, right?

THE WITNESS: Yes.

THE COURT: And so he's wondering why you would be reliant on something that Mr. DeLong would tell you as opposed to what the machine might tell you.

THE WITNESS: Mr. DeLong didn't tell me that she was not Kelly. Mr. DeLong stated that she was Barb.

Q   Correct. And based on that you had a suspicion.

A   Yes, I had a suspicion that --

Q   Based on what Mr. DeLong said not anything else.

A    No. Based on the fact that I walked out of the office with the information from Kelly and the person that was with her called her Barb raised suspicion to me.

(MTS Trans. Vol. I at 23-26.)

{¶ 25} Later during cross-examination, defense counsel continued to question Officer Perdue about the reason for Davis's arrest and whether Davis had provided false information to the Dayton police officers:

Q    Okay. Then when you return and place Ms. Davis in handcuffs, what are you arresting her for?

A    For, at this point, she gave us the wrong identifiers.

Q    But she didn't give you anything.

A    Yes, she did give us --

Q    You told me that you got that from the personnel.

A    She didn't give it to us right then. But she came out to the car and told us her name was Kelly.

Q    Wait, before we get to that. So when you returned to take her to the car, she hadn't told you her name yet. That was after she got outside.

A    At that point, I did not know she was Barbara. I mean, I didn't have her confirmed as Barbara Davis. I was still running the information for Kelly.

* * *

THE COURT: And when did she tell you she was Kelly?

[A]:    In-between -- well, the Security gave us information for Kelly. When I walked back in and tried to get her identifiers, she told me that her name was Kelly.

THE COURT:    She told you that in the Security room.

[A]:    Or either walking out to --

THE COURT:    Or as you're walking out.

[A]:    At some point, even outside, she still claimed that her information was Kelly's information.

THE COURT:    Okay.

[A]:   Yes.

THE COURT:   Got it.

BY [Defense Counsel]:

Q   Officer, I'm not trying to beat a dead horse here. But you escort DeLong out, return, handcuff Ms. Davis before an initial patdown. You still don't have her saying the name Kelly Wood yet.

A   When I was in the office, Good Sam's officers asked me to run a --

Q   I'm asking you what she said not the Good Sam officers.

A   She told me that her name was Kelly.

Q   Well, now --

THE COURT:   He wants to know when.   When did --

BY [Defense Counsel]:

Q   When?

A   I do not recall exactly when.

Q   Well, that's important.

A   But --

THE COURT:   Well, I decide if it's important.

[Defense Counsel]:   I understand, Judge.

BY [Defense Counsel]:

Q   But it's possible it was outside.

A   When I got the information from the officers, Ms. Davis was present when the information of her being Kelly, she was present.   And she did not tell me that her name was not Kelly.

Q    She didn't tell you either way.

A    Eventually.

Q    Eventually.

A    Yes.

Q    So you escort her outside maybe based on what the Good Sam officers told you about her name but the arrest is on false identifying information. That's what you testified to, correct?   The initial handcuffing.

A    Correct.

(MTS Trans., Vol I, at 28-31.)

{¶ 26} After the trial court and the prosecutor discussed who would be called after Officer Perdue, the trial court stated, "Well, why don't you have a seat and I'll tell you what's going through my mind.   Maybe this won't be of benefit to anybody but I'll share it with you."   The trial court then described his view of the evidence and the issues, as follows:

And that is Officer Perdue's testimony implicates, among other things, the plain view doctrine and it also implicates the inevitable discovery doctrine because Officer Perdue points out, as I gather from his testimony, it seemed rather clear, that when he got there, he was informed by Security personnel at the hospital that there were two folks that they had detained. One was Mr. DeLong who apparently was a rather unpleasant and ungallant chap and someone they identified as Kelly.

Officer Perdue testified that they gave him the identifiers for Mr. DeLong who, as I understood, was cuffed when he got there perhaps owing

to his less than pleasant demeanor. And that, so he got his identifiers.

And they also gave him identifiers for the woman while she was in his presence and they gave him identifiers for one Kelly Wood. And Ms. Davis, as it turns out, didn't do anything, according to his testimony, to disabuse him of that information that was provided in his presence.

So he goes to the car and while at the car, Prince Charming says oh by the way, Barb has got a whole bunch of stuff, presumably trying to make things better for him. Ain't love grand. And then, in any event, when he uses the word "Barb", Officer Perdue becomes, at least in my opinion, naturally suspicious and returns to inquire. And he believes now I've been given false information. The woman he's identified as the Defendant has given him false information to the Good Samaritan authorities and they've imparted that same false information to him, unwittingly, but they do it in her presence.

And so he decides I'm going to arrest her for giving me false information which is, in fact, an arrestable offense. And, therefore, as an arrestable offense and he had divined he was going to do that, then the inevitable discovery doctrine kicks in. Because once she was arrested, she's most definitely going to be patted down and most definitely going to be searched at the jail and they're going to find what they find notwithstanding the juxtaposition of (1) was she Mirandized and so forth.

Seems to me that there's probable cause to arrest for the false information. * * *

{¶ 27} As stated above, there were two hearings on Davis's motion, and the grounds for Davis's arrest were thoroughly addressed at the first suppression hearing. Officer Perdue testified that Davis was arrested due to his belief that she had provided false identifying information, and there were several questions addressing when and to whom Davis identified herself.

{¶ 28} The issue of probable cause for Davis's arrest was again addressed with Officer Perdue at the second suppression hearing. Upon questioning by the trial court, Perdue testified that he requested Davis's "identifiers" and Officer LaForce provided what he believed to be her Social Security number. Perdue ran that information through his computer, and it came back to Kelly Wood. The court further asked:

THE COURT: Okay. At that point, your notes reflect that, based on the information given by DeLong which was essentially to pin everything on Ms. Davis and the fact that the identifiers that she had given to Good Samaritan personnel didn't match up to her, then you decided to put her in cuffs, correct?

[OFFICER PERDUE]: Correct.

(MTS Trans., Vol. II, at 10.) Perdue testified that Davis admitted that her name was not Kelly Wood after the officer found her Social Security card in her purse.

{¶ 29} Under the circumstances before us, the State was made aware at the suppression hearings that the timing of and basis for Davis's arrest was a significant issue.

{¶ 30} However, there was no suggestion in Davis's motion, at the suppression hearing, or otherwise that the status of the Good Samaritan Hospital officers as law

enforcement officers was in question. We note that both LaForce and Wolfe were subpoenaed by both parties. Davis's subpoenas of Officers LaForce and Wolfe referred to the officers as "Campus Police." The State's subpoenas of the Good Samaritan Hospital officers were sent to "Good Samaritan Hospital Police Dept." During the hearing on March 3, defense counsel stated that he had released Officer Wolfe because Wolfe "had nothing to contribute to the case." Officer LaForce was subpoenaed, but failed to appear. Defense counsel noted that, based on LaForce's written report, it appeared that LaForce's testimony could potentially contradict Officer Perdue's testimony on the issue of plain view and could clarify who carried Davis's handbag outside from the security office. Counsel stated, "That's the only reason I thought, depending on your ruling, that that might be important." Davis's counsel did not assert that LaForce's testimony would be relevant to whether there was probable cause to arrest Davis.

{¶ 31} Upon review of the record, we conclude that the State was on notice that the issue of probable cause was before the trial court. However, the issue of whether the Good Samaritan officers were "law enforcement officers" or "public officials" was not properly raised and was not addressed by the parties and, consequently, that issue was waived by Davis.

### III. Probable Cause to Arrest for Providing False Identifying Information

{¶ 32} Davis claims that the Dayton police officers lacked probable cause to arrest her, because she did not provide "false identifying information" directly to the Dayton police officers. As stated above, Davis also claims, for the first time on appeal, that Good Samaritan Hospital's security officers did not fall within the definition of a "public official," and thus she did not commit either obstructing official business or falsification when she

told hospital security that her name was Kelly Wood.

{¶ 33} At the outset, there is no offense called "providing false identifying information." The only potentially relevant statutes are obstructing official business (R.C. 2921.31), falsification (R.C. 2921.13), and failure to disclose personal information (R.C. 2921.29). Davis addresses the issue of probable cause by reference to the obstructing official business and falsification statutes; neither of the parties discusses R.C. 2921.29.

{¶ 34} The obstructing official business statute provides: "No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties." R.C. 2921.31(A). R.C. 2921.13 proscribes falsification as follows: "(A) No person shall knowingly make a false statement, or knowingly swear or affirm the truth of a false statement previously made, when any of the following applies: * * * (3) The statement is made with purpose to mislead a public official in performing the public official's official function."

{¶ 35} For purposes of obstructing official business and falsification, R.C. 2921.01 defines a "public official" as "any elected or appointed officer, or employee, or agent of the state or any political subdivision, whether in a temporary or permanent capacity, and includes, but is not limited to, legislators, judges, and law enforcement officers." R.C. 2921.01(A).

{¶ 36} The Supreme Court of Ohio has stated that "the making of an unsworn false oral statement to a public official with the purpose to mislead, hamper or impede the investigation of a crime is punishable conduct within the meaning of R.C. 2921.13(A)(3)

and 2921.31(A)." *State v. Lazzaro*, 76 Ohio St.3d 261, 667 N.E.2d 384 (1996), syllabus.

{¶ 37} First, we agree with Davis's implicit argument that the relevant conduct by Davis was her providing information to the Good Samaritan Hospital security officers, not the security officers' relaying of that information to the Dayton police officers. In order to commit obstructing official business, an individual must commit "an overt act done with an intent to obstruct the officers" and the act must succeed in actually hampering or impeding the officers. *State v. Crawford*, 2d Dist. Montgomery No. 25506, 2013-Ohio-4398, ¶ 20, quoted by *State v. Terry*, 2d Dist. Montgomery No. 26722, 2016-Ohio-3484, ¶ 22. Although Davis was present when Office LaForce provided incorrect information about Davis to Officer Perdue, Davis committed no overt act at that time (i.e., knowingly make a false statement to Officer Perdue) to justify an obstructing official business charge. Nor did Davis "knowingly swear or affirm the truth of a false statement previously made," as required for falsification. *See* R.C. 2921.13(A).

{¶ 38} Accordingly, we focus on whether Officer Perdue had probable cause to believe that Davis had violated the law when she falsely informed the Good Samaritan Hospital security officers that her name was Kelly Wood. Even assuming that the Good Samaritan Hospital officers were public officials within the meaning of the obstructing official business and falsification statutes, we agree with Davis that Officer Perdue lacked probable cause to arrest her for committing those offenses.

{¶ 39} A woman (later identified as Davis) and her companion, DeLong, were held at the Good Samaritan Hospital security office due to DeLong's possession of heroin. The record does not contain details of the investigation by the Good Samaritan Hospital officers, but the woman told the officers that her name was Kelly Wood. When the

Dayton police officers arrived, DeLong was handcuffed in the detention area. The woman was seated, without handcuffs, with her handbag in the security office; she was not under arrest, and there is no indication in the record that the hospital officers were aware that the woman had provided a false name or believed that the woman had committed a criminal offense.

{¶ 40} When Officer Perdue later asked the hospital officers for the woman's identifying information, Officer LaForce conveyed to Officer Perdue the information previously provided by the woman, i.e., that her name was Kelly Wood. The woman was present when this occurred, but she did not correct the information. Officer Perdue ran the name Kelly Wood, as provided by the woman, and he found a person listed under that name; nothing in the computer search indicated that Kelly Wood was not the correct name for the woman in the security office.

{¶ 41} At that juncture, the only information that Officer Perdue had to suggest that the woman had provided a false name was DeLong's reference to her as "Barb," whereas the woman had previously identified herself to the Good Samaritan Hospital officers as Kelly Wood. DeLong's reference to the woman by a name other than "Kelly" raised a suspicion in Officer Perdue's mind that the woman was concealing her identity because, according to DeLong, she had drugs. As Perdue testified, he wanted "to try to figure out who she was" and that the difference in the names "raised suspicion to me." And the trial court similarly stated in its summation following Perdue's first day of testimony that the officer became "naturally suspicious and return[ed] to inquire."

{¶ 42} At that point, Officer Perdue had a reasonable suspicion that the woman (Davis) had given a false name to the Good Samaritan officers, and he could have asked

her additional questions, asked to see her identification, or otherwise investigated his suspicions. *See Adams v. Williams*, 407 U.S. 143, 145-146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) ("A brief stop of a suspicious individual, in order to determine his [or her] identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.").

{¶ 43} "Reasonable suspicion" is a less demanding standard than "probable cause," not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause. *State v. Greene*, 4th Dist. Scioto No. 94CA2297, 1996 WL 255868 (May 15, 1996), citing *Adams v. Williams*, 407 U.S. 143, 145-146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). As stated by the United States Supreme Court:

> "The substance of all the definitions" of probable cause "is a reasonable ground for belief of guilt." And this "means less than evidence which would justify condemnation" or conviction, as Marshall, C.J., said for the Court more than a century ago in *Locke v. United States*, 7 Cranch 339, 348, 3 L.Ed. 364. Since Marshall's time, at any rate, it has come to mean more than bare suspicion: Probable cause exists where "the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed.

These long-prevailing standards seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice.

(Citations omitted.) *Brinegar v. United States*, 338 U.S. 160, 175-176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

{¶ 44} At the time Officer Perdue arrested Davis for "providing false identifying information," he merely had a reasonable suspicion that the woman in the security office had provided false identifying information to the police. In the absence of additional information indicating that Kelly Wood was not the name of the woman in the security office (Davis), her arrest for providing false identifying information was not based on probable cause.

{¶ 45} Because Davis's arrest was not based on probable cause, the officers' search of Davis and her handbag were not a search incident to a lawful arrest, and there was no evidence that, absent the arrest, Davis's person or her handbag would otherwise

have been searched. All evidence flowing from Davis's unlawful arrest – the drugs and her statements, must be suppressed as fruit of the poisonous tree.

### III. Conclusion

{¶ 46} The trial court's judgment will be reversed, and the matter will be remanded for further proceedings.

. . . . . . . . . . . . .

DONOVAN, J., concurs.

HALL, P.J., dissenting:

{¶ 47} In my opinion, officer Perdue had probable cause to arrest Barbara Davis upon learning she had provided false identifying information even if, because of technical nuance, the evidence may have been insufficient at trial to sustain a conviction. Incident to that arrest, the cocaine in her purse was discovered and was admissible.

{¶ 48} Initially, I agree with the State that the defense did not adequately raise in its suppression motion any issue about probable cause to arrest Davis. Furthermore, "there was no suggestion in Davis' motion * * * that the status of the Good Samaritan Hospital officers as law enforcement officers was in question." (*Supra*, ¶ 30). That being so, the trial court correctly overruled the motion to suppress on the basis that providing false identifying information to Good Samaritan Hospital police provided probable cause for her arrest and that the drugs were found as a result of a constitutional custodial search.

{¶ 49} In addition, there is no doubt that Davis provided false identification information to Good Samaritan Hospital police officers who had detained her after they handcuffed and detained her companion for heroin possession. In Davis' presence, the hospital police conveyed the false identification information to Dayton police officer

Perdue. Upon learning from Davis' companion that Davis had provided false identification information, Perdue arrested her.

> "Probable cause to arrest exists when a reasonably prudent person would believe that the person to be arrested has committed a crime." *State v. Adams*, 2d Dist. Montgomery No. 24184, 2011-Ohio-4008, ¶ 7. "[P]robable cause is a concept that must be based on the totality of the circumstances, because it 'deals with probabilities—the factual and practical nontechnical considerations of everyday life on which reasonable and prudent men act.' " (Citations omitted.) *State v. Etherington*, 172 Ohio App.3d 756, 2007-Ohio-4097, 876 N.E.2d 1285, ¶ 20 (2d Dist.).

*State v. Turner*, 2016-Ohio-7983, 74 N.E.3d 858, ¶ 19 (2d Dist.).

**{¶ 50}** In *State v. Thomas*, 2d Dist. Montgomery No. 21430, 2006-Ohio-6612, we commented that "[t]he standard of probable cause is a practical, nontechnical concept that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id*. at ¶ 9, citing *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

**{¶ 51}** In several decisions, we have recognized that Good Samaritan Hospital police officers have been licensed by the City of Dayton as special police officers who are permitted to carry weapons, have powers of arrest on hospital property, and have authority to investigate criminal activity on hospital property.[2]  Because the majority

---

[2] *State v. Grimes*, 2d Dist. Montgomery No. 22317, 2008-Ohio-4390, ¶ 8; *State v. Buford*, 2d Dist. Montgomery No. 22149, 2008-Ohio-2231, ¶ 9; *State v. Shelton,* 2d Dist. Montgomery No. 22116, 2008-Ohio-1876, ¶ 2; *State v. Moore*, 2d Dist. Montgomery No. 18337, 2001 WL 28670, *2 (Jan. 12, 2001).

concludes that the status of the Good Samaritan Hospital officers as law enforcement officers was not a question raised by the motion to suppress, misrepresentation of her identity to these licensed special police officers, who were investigating the felony committed by Davis' companion, is sufficient to constitute an arrestable offense. But even if we had not recognized the status of Good Samaritan Hospital personnel, it is reasonable that Officer Perdue would not discern a possible distinction between Davis misrepresenting her identity to Good Samaritan police (or Good Samaritan police transmitting the false identity, in her presence, to himself) as opposed to her directly misrepresenting the information to him. Whether the factual scenario of this misrepresentation would be sufficient for a conviction is distinct from the conclusion that the officer had probable cause to place her under arrest. In drawing this conclusion, I also have considered the U.S. Supreme Court's holding, in regard to reasonable articulable suspicion, in *Heien v. North Carolina*, __ U.S. __, 135 S.Ct. 530, 190 L.Ed.2d 475 (2014), where the Court held that an officer's mistake of law in stopping a vehicle with one functioning brake light, when the state vehicle code requires only one working brake light, was a reasonable mistake that did not violate the Fourth Amendment's prohibition against unreasonable searches and seizures. In my opinion, Perdue had probable cause to arrest Davis when her companion stated her true name was Barbara Davis, that the syringe in his possession was hers, and that she was in possession of more drugs. I disagree with the majority's conclusion that the information provided by the companion "merely" (*supra*, ¶ 44) amounted to a reasonable articulable suspicion that Davis had committed an offense. That conclusion ignores "the factual and practical nontechnical considerations of everyday life on which reasonable and prudent men act," in particular the fact that Davis'

companion, in order to shift blame from himself to Davis, has accurately revealed that she has hidden her identity and her stash of drugs. But even if reasonable suspicion is all that Perdue had at that point, it does not change the constitutional analysis. Perdue would have been constitutionally justified in detaining Davis, taking her, even in handcuffs, to his vehicle to verify her identity, and inevitably the correct identity and possession of the drugs and paraphernalia would have been discovered.

{¶ 52} I therefore dissent and would affirm the trial court's denial of Davis' motion to suppress.

Copies mailed to:

Heather N. Jans
Carlo C. McGinnis
Hon. Steven K. Dankof