OPINION
{¶ 1} This matter is before the Court on the Notice of Appeal of Ennis P. Lungs, filed April 10, 2008. On November 3, 2006, Lungs was indicted on 25 counts of dogfighting, in violation of R.C. 959.16(A)(3), felonies of the fourth degree, and two counts of possession of criminal tools, in violation of R.C. 2923.24(A), felonies of the fifth degree. On November 20, *Page 2 
2 2006, Lungs filed a motion to suppress, which the trial court overruled on April 13, 2007, after a hearing. Following a jury trial, Lungs was found guilty and sentenced to 18 months on each dogfighting offense, and to one year on each possession of criminal tools offense, all terms to be served concurrently, for a total of 18 months. The trial court also ordered Lungs to pay restitution to the Montgomery County Animal Resources Center for economic loss in the amount of $50,000.00.
 {¶ 2} The events giving rise to this matter began on October 25, 2006, at approximately 5:45 p.m., when City of Dayton Police Officers John Zimmerman and Ronald Velez, while on routine patrol in a marked cruiser, proceeded down an alley behind 43 Boltin Street. The officers observed a gray minivan with its back and side doors completely open. The van was parked facing the rear of 43 Boltin Street, behind a fence that enclosed the yard, and beside a pickup truck. The officers observed several animal crates containing dogs inside and next to the van, along with two dogs chained to the fence and an additional dog in the yard. There were three men near the van.
 {¶ 3} The officers passed by but then backed up their cruiser, stopping near the van. They did not utilize their emergency lights and siren. Zimmerman and Velez exited their cruiser, approached the men and asked them for identification. The men produced drivers' licenses; they were Eric A. Lewis, who lived at 43 Boltin Street, Sharod Brasher, and Lungs. None of the men had any outstanding warrants. Zimmerman asked them "what was going on with the dogs." Lungs indicated that he owned the van and was in the business of transporting dogs, and that he had brought the dogs from Texas. Brasher stated that he was there to pick up a puppy he had purchased from Lungs. Brasher stated that he was on his lunch break and requested permission *Page 3 
to return to work. The officers allowed him to leave, but prohibited him from taking a puppy. There was no evidence as to the ownership or use of the area where the encounter occurred.
 {¶ 4} Zimmerman testified at the hearing on the motion to suppress that he received permission from Lungs to look into the van; Lungs denied giving Zimmerman permission. Zimmerman also testified that Lungs was not under arrest or in custody when he provided his identification to Zimmerman, but that Lungs was "detained."
 {¶ 5} The van contained approximately 22 crates and 22-25 dogs, some, if not all of which, were pit bulls. In the context of a previous raid, Zimmerman had been alerted by Montgomery County Animal Control personnel regarding certain indicia of dogfighting, including wounds on the animals, certain medications and injection devices, and large brass rings on the dogs' collars. While walking around the van and using his flashlight to look inside, Zimmerman observed a dog with a collar ring, injuries and scarring, and also a loaded hypodermic syringe. In the course of his observations, Zimmerman leaned into the van. As he walked around the back of the van, Zimmerman observed two weapon clips and loose bullets in the pockets of the open rear door.
 {¶ 6} Zimmerman advised Velez "that there might be a gun somewhere close, either in the van, around the van, or on one of the people." At that point the officers patted down Lungs and Lewis and placed them in the rear of the cruiser. The men were not handcuffed, and they were orally advised of their Miranda rights and acknowledged that they understood them upon being placed in the cruiser. Zimmerman then walked around the van again, observing a duffel bag in the truck next to the van. Zimmerman asked Lewis if the truck was his, and Lewis affirmed that it was. Zimmerman obtained Lewis' permission to look in the truck, and he found *Page 4 
additional hypodermic syringes and medication in the duffel bag.
 {¶ 7} At about 6:15, the officers called their supervisors and Animal Control. Dayton Detective Keith Coberly was also contacted, having recently been involved in the investigation of several dogfighting operations. At 8:45, Lungs signed a Consent to Search form authorizing the police to search his van. Coberly arrived at the scene at about 9:00 p.m. and interviewed Lungs and Lewis. At 12:35 a.m. on October 26, the police obtained a search warrant for 43 Boltin Street and they executed the warrant shortly thereafter. Lungs was not handcuffed while he was detained, until he was arrested and transported to jail. During his detention, he was fed and allowed to relieve himself.
 {¶ 8} Lungs asserts one assignment of error as follows:
 {¶ 9} "THE CONVICTIONS SHOULD BE REVERSED BECAUSE THE EVIDENCE WAS SEIZED IN VIOLATION OF THE FOURTH AMENDMENT OF THE U.S. CONSTITUTION."
 {¶ 10} According to Lungs, the "standard here should be probable cause and not reasonable suspicion, because the officers trespassed onto Mr. Lewis' property to make their detention." Lungs further argues, the "plain view or open view exception would not apply." Finally, Lungs avers that the officers did not "have a reasonable suspicion."
 {¶ 11} As we have previously noted, "The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution guarantee `the right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' It is well established that these guarantees are not implicated in every situation where the police have contact with an individual. (Internal citation omitted). The United States *Page 5 
Supreme Court has created three categories of police-citizen contact to identify the situations where these guarantees are implicated. (Internal citation omitted).
 {¶ 12} "The first type is a consensual encounter. Encounters are consensual where the police merely approach a person in a public place, engage the person in conversation, request information, and the person is free not to answer and walk away. (Internal citation omitted). The request to examine one's identification does not make an encounter nonconsensual. (Internal citations omitted). Nor does the request to search a person's belongings. (Internal citation omitted). TheFourth Amendment guarantees are not implicated in such an encounter unless the police officer has by either physical force or show of authority restrained the person's liberty so that a reasonable person would not feel free to decline the officer's requests or otherwise terminate the encounter. (Internal citation omitted). Once a person's liberty has been restrained, the encounter loses its consensual nature and falls into one of the next two Supreme Court categories.
 {¶ 13} `* * *
 {¶ 14} "The second type of encounter is a `Terry stop' or an investigatory detention. The investigatory detention is more intrusive than a consensual encounter, but less intrusive than a formal custodial arrest. The investigatory detention is limited in duration and purpose and can only last as long as it takes a police officer to confirm or to dispel his suspicions. * * * A person is seized under this category when, in view of the circumstances surrounding the incident, by means of physical force or show of authority a reasonable person would have believed that he was not free to leave or is compelled to respond to questions. (Internal citations omitted).
 {¶ 15} "The Supreme Court * * * listed factors that might indicate a seizure. These *Page 6 
factors include a threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person, the use of language or tone of voice indicating that compliance with the officer's request might be compelled, approaching the citizen in a nonpublic place, and blocking the citizen's path. (Internal citation omitted). A police officer may perform an investigatory detention without running afoul of the Fourth Amendment as long as the police officer has a reasonable, articulable suspicion of criminal activity.
 {¶ 16} `* * *
 {¶ 17} "Reasonable suspicion entails a minimum level of objective justification for making a stop. (Internal citation omitted). It entails more than an inchoate or unparticularized suspicion or `hunch,' but less than the level of suspicion required for probable cause. * * * In making a determination of reasonable suspicion, the relevant inquiry is not whether particular conduct is innocent or guilty, but the degree of suspicion that attaches to particular types of noncriminal acts."State v. Taylor (1995), 106 Ohio App.3d 741, 747-49, 752, 667 N.E.2d 60.
 {¶ 18} Lungs initially argues that his encounter with the officers occurred on Lewis' private property, and that as Lewis' friend and "social guest," Lungs had "a legitimate expectation of privacy while in Lewis' yard."
 {¶ 19} "[T]he extent to which the Fourth Amendment protects people may depend upon where those people are. * * * [C]apacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." Minnesota v. Carter (1998), 525 U.S.83, 88, 119 S.Ct. 469. An overnight guest in a home has "the sort of expectation of privacy that the Fourth Amendment protects." Id., at 89. A guest who is "merely present with the *Page 7 
consent of the owner," however, lacks the requisite expectation of privacy. Id.
 {¶ 20} Further, as the trial court correctly noted, "`[N]oFourth Amendment search occurs when police officers who enter private property restrict their movements to those areas generally made accessible to visitors — such as driveways, walkways, or similar passages.' LaFave,Search and Seizure (1978), at § 2.3 at pp. 322-23, as cited in UnitedStates v. Reed (8th Cir., 1984), 773 F.2d 492, at 501." TheFourth Amendment "protects people, not places," and "[w]hat a person knowingly exposes to the public, even in his own home or office, is not the subject of Fourth Amendment protection." (Internal citation omitted).Katz v. United States (1967), 389 U.S. 347, 351, 88 S.Ct.507.
 {¶ 21} Lungs was clearly not Lewis' overnight guest; there was no evidence to suggest that Lungs even entered Lewis' fenced in yard, let alone his home. Lungs was merely present to complete a commercial transaction, namely to sell a puppy to Brasher. Lungs had no expectation of privacy in the area adjacent to the alley.
 {¶ 22} Lungs further argues, "This is actually an `open view' and not a `plain view' case." The term "open view" is "descriptive of a situation in which there has been no search at all in theFourth Amendment sense. This situation * * * encompasses those circumstances in which an observation is made by a police officer without a prior physical intrusion into a constitutionally protected area. This includes the case in which an officer discovers an object which has been left in an `open field' or similar nonprotected area, and also those cases in which an officer — again, without making a prior physical intrusion — sees an object on the person of an individual, within premises, or within a vehicle. In each of these instances there has been no search at all because of the plain view character of the situation, and this means that the *Page 8 
observation is lawful without the necessity of establishing either pre-existing probable cause or the existence of a search warrant or one of the traditional exceptions to the warrant requirement." State v.Lang (1996), 117 Ohio App.3d 29, 34-35, 689 N.E.2d 994.
 {¶ 23} "The Plain View Doctrine is a well-established exception to the warrant requirement. Evidence in plain view is subject to seizure when the intrusion affording the plain view is lawful (or the officer is lawfully in place) and the incriminating nature is immediately apparent. (Internal citations omitted). `Immediately apparent' means the police have probable cause to associate an object with criminal activity. An officer may rely on training and experience in recognizing evidence of a crime." State v. Buckner, Montgomery App. No. 21892, 2007-Ohio-43392.
 {¶ 24} The trial court's analysis discussed both open view and plain view, as this record reveals both doctrines are in play in this case. Under either analysis, no Fourth Amendment violation occurred. As noted by the trial court, as Zimmerman and Velez proceeded down the alley, they were able to observe numerous dogs in crates both in and outside Lungs' van, dogs chained to the fence, and a dog in the yard. The van, Lungs, Lewis and Brasher were in an area adjacent to the alley and separated from Lewis' back yard by a fence. The officers approached the men in a nonthreatening manner when they exited their cruiser, engaging them in conversation. In walking around the open van, Zimmerman, who was knowledgeable regarding certain indicia of dogfighting, observed a dog with "a lot of scarring" and a brass ring on its collar, a syringe, weapon clips and bullets in open view, exposed to the public. As the trial court correctly noted, the fact that Zimmerman leaned into the van and utilized a flashlight in observing the evidence does not elevate his conduct to a search, and it does not negate the fact *Page 9 
that the items were otherwise openly visible. Lang; State v. Pitts, Montgomery App. No. 18964, 2001-Ohio-1829 ("We cannot agree that there exists an invisible boundary line around the interior of a vehicle which the police officers may not cross. Therefore, we determine that leaning into a vehicle and illuminating the interior is not a search," citingState v. Reaves (Nov. 3, 2000), Montgomery App. 18302).
 {¶ 25} Additionally, we note, it is clear from the record that a reasonable person in Lungs' position would have felt free to terminate the encounter with the officers. Lungs was in an area adjacent to an alley, and his liberty was not restrained by physical force or a show of authority. Brasher was clearly able to terminate the encounter and go home. Instead of doing so, Lungs conversed with the officers while Zimmerman walked around the open van, observing significant evidence of dogfighting, along with weapon clips and bullets.
 {¶ 26} Upon observation of the evidence, the officers had a reasonable articulable suspicion, and not a mere hunch, that criminal activity was afoot and thus were permitted to detain Lungs and Lewis while they continued to investigate. The discovery of weapon clips and bullets indicated safety concerns as well. As the trial court correctly noted, "[a]ll the contacts in this case were consensual until the Defendants were placed in the cruiser."
 {¶ 27} Lungs later signed a consent form, granting the officers permission to search his van. There is no evidence of duress or coercion; Lungs was not handcuffed while in the cruiser, he was given food and he was taken to the police station to use the bathroom. Lungs' sole assignment of error lacks merit. There being no Fourth Amendment violation, Lungs' assignment of error is overruled. Judgment affirmed. *Page 10 
 BROGAN, J. and GRADY, J., concur. *Page 1