OPINION
{¶ 1} Eric A. Lewis pled no contest to fourteen counts of dogfighting, all fourth degree felonies, and three counts of possession of criminal tools, all fifth degree felonies, in the Montgomery County Court of Common Pleas. The court had previously overruled Lewis' motion to suppress evidence. The trial court sentenced him to one year in prison on each count, *Page 2 
to be served concurrently, and it ordered him to pay restitution of $50,000 to the Montgomery County Animal Resources Center and court costs. Lewis appeals from the denial of his motion to suppress. For the following reasons, the trial court's judgment will be affirmed.
 I {¶ 2} The state's evidence at the suppression hearing established the following facts.
 {¶ 3} At approximately 5:45 p.m. on October 25, 2006, Dayton police officers John Zimmerman and Ronald Velez were driving in a marked cruiser toward 9 Boltin Street, the location of a large drug raid that had occurred the night before. As the officers drove along the alley behind the residences on Boltin Street, they observed an open gray minivan and a green pickup truck parked on the grass on the alleyside of the fence to the rear of 43 Boltin Street, Lewis' residence. As they proceeded by, the officers saw several crates containing pitbulls through the minivan's open back door, crates outside the open passenger side of the minivan, two pitbulls chained to a fence, and an additional dog in the yard. Three men were standing near the van on the alleyside of the fence.
 {¶ 4} The officers backed up the cruiser, and they approached the three individuals, who were later identified as Eric Lewis, Ennis Lungs, and Sharod Brasher. The officers identified themselves, asked permission to speak with the individuals, and asked what was going on with the dogs. Lungs responded that he was from Texas and that he transports animals for a living. Brasher told the officers that he was there to pick up a puppy he had purchased from Lungs and that he was on his lunch break and needed go to work. The officers requested identification from the men, and the *Page 3 
three gave the officers their identification. After Zimmerman got Brasher's information, the officers permitted him to leave, but he was not allowed to take a dog.
 {¶ 5} While Velez continued to talk with Lewis and Lungs, Zimmerman walked around the van and shined his flashlight at the crates through the open door. Based on a prior conversation with Animal Control about evidence of dogfighting, Zimmerman looked for hypodermics, scarring on the animals, and a large brass ring on the dogs' collars. He observed approximately 25 pitbulls, including approximately six puppies; one of the dogs had the large brass ring and a lot of scarring. Velez later also observed several dogs with obvious scarring or injuries.
 {¶ 6} According to Zimmerman, he then asked for and received oral permission from Lungs, the van's owner, to look into the van. (Lungs testified that he did not give Zimmerman permission.) Zimmerman stuck his head into the van and saw a hypodermic syringe. He also observed two loaded weapon clips for a firearm and loose ammunition in the pockets of the open rear door. At this point, at approximately 6:15 p.m., Velez frisked Lewis for weapons, handcuffed him, and placed him in the rear of the cruiser. Velez also advised Lewis of his Miranda rights, and Lewis acknowledged that he understood them upon being placed in the cruiser. At the same time, Zimmerman patted down Lungs, placed him in the cruiser, and advised him of his Miranda rights. The officers testified that the men were not free to leave once they were placed in the cruiser.
 {¶ 7} The officers contacted their supervisors and Animal Control. While Lewis was detained in the cruiser, Zimmerman asked him if there was anything inside the truck he should be aware of. Lewis responded that there was not. When Zimmerman *Page 4 
asked for permission to check, Lewis responded, "Go ahead." Zimmerman walked to the passenger side of the vehicle and retrieved a duffle bag containing additional hypodermic syringes and medication. The duffle bag apparently belonged to Lungs. Lewis denied the officer's request to search his house.
 {¶ 8} Within approximately one hour, Lewis' handcuffs were removed. During the evening, Lewis was placed into a separate cruiser, which was driven to the front of 43 Boltin Street. When the officers' shift changed, Lewis was transferred to a different cruiser. At about 8:45 pm., Lewis was driven to the police department on Helena Street to use the bathroom.
 {¶ 9} Between approximately 8:30 p.m. and 9:00 p.m., Detective Keith Coberly, who had recently been involved in the investigation of several dogfighting operations, arrived at the scene. Coberly spoke with the other officers at the scene and Mark Kumpf of the Animal Resource Center. Coberly then looked at the dogs inside and outside of the van and outside in the yard. Afterward, Coberly went to the cruiser in front of 43 Boltin Street to interview Lewis. Coberly asked Lewis if he had been advised of his Miranda rights, and Lewis responded that he understood his rights. During the conversation, Lewis admitted that he had a slat mill (equipment used to condition dogs for dogfighting) and dogs inside his house. Lewis denied owning any of the dogs outside the house. Based on the information Coberly received, he prepared a search warrant affidavit and obtained a search warrant for 43 Boltin Street.
 {¶ 10} At approximately 8:45 p.m., Lungs signed a consent to search form authorizing the search of his van. Lewis' house was searched in the early morning of October 26, 2006, after a search warrant was obtained. Thirteen dogs and numerous *Page 5 
dogfighting-related items, including a slat mill, scales, medication and medical equipment, were seized from the residence.
 {¶ 11} Lewis and Lungs were arrested at approximately 2:00 a.m. on October 26, 2006. Lewis was subsequently indicted for fourteen counts of dogfighting, in violation of R.C. 959.16(A)(3), and three counts of possession of criminal tools. (Lungs was also charged with numerous counts of dogfighting and possession of criminal tools.)
 {¶ 12} On November 21, 2006, Lewis moved to suppress all evidence seized from 43 Boltin Street, arguing that the affidavit in support of the search warrant failed to establish probable cause for the search, the warrant lacked specificity, and the officers seized items outside the scope of the warrant. Lewis also sought to suppress any statements made and any physical evidence obtained as a result of his statements. Lewis argued that his statements were made involuntarily and without intelligently waiving his Miranda rights.
 {¶ 13} Hearings on the suppression motions were held on February 2, March 1, and March 22, 2007. In his supplemental memorandum after the hearings, Lewis raised additional arguments by adopting the arguments made by Lungs in his separate motion to suppress, which challenged the officers' initial intrusion, the initial searches, and the protracted detention of Lungs and Lewis.
 {¶ 14} The trial court denied Lewis and Lungs' motions to suppress. The trial court first concluded that "[a]ll the contacts in this case were consensual until the Defendants were placed in the cruiser." The court noted that neither Lewis nor Lungs had an expectation of privacy in the area where the conversation took place, even if it *Page 6 
occurred on private property. At the time Lewis and Lungs were detained in the cruiser, the officers had a reasonable and articulable suspicion of criminal activity that justified their detention while an investigation continued.
 {¶ 15} The trial court further found that the officers' observations of the dogs was the result of open observation, not a search. Neither the officers' use of a flashlight to illuminate the interior of the minivan nor leaning into the vehicle converted the open observations into a search. The court also concluded that Lungs' consent to search his van was voluntary and that Lewis and Lungs each voluntarily waived his Fifth and Sixth Amendment rights. As for the search warrant, the trial court concluded that the information contained in the affidavit was constitutionally obtained and that there were sufficient facts and circumstances for the issuing judge to find probable cause.
 II {¶ 16} In his sole assignment of error, Lewis claims that the trial court erred in overruling his motion to suppress.
 {¶ 17} In reviewing the trial court's ruling on a motion to suppress evidence, this court must accept the findings of fact made by the trial court if they are supported by competent, credible evidence. SeeState v. Morgan, Montgomery App. No. 18985, 2002-Ohio-268. However, "the reviewing court must independently determine, as a matter of law, whether the facts meet the appropriate legal standard." Id.
 {¶ 18} On appeal, Lewis claims that the officers initiated an investigative detention when they entered his property to inquire about the dogs. Lewis further asserts that the officers then unlawfully searched Lungs' van and his truck, which *Page 7 
ultimately led to evidence in support of the search warrant.
 {¶ 19} As an initial matter, the State argues that Lewis waived his challenges to the initial intrusion, the police looking into the van, and the consent to search the truck because he failed to raise these issues prior to the suppression hearing. We agree with the State that Lewis should have raised these issues in his motion. However, because we agree with the trial court that the evidence was lawfully obtained, we will nevertheless address Lewis' arguments.
 {¶ 20} The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. Terry v. Ohio
(1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. Not all interactions between citizens and the police, however, constitute a seizure. Rather, the interactions between citizens and law enforcement officers can fall within three distinct categories: a consensual encounter, an investigative detention, and an arrest. State v. Taylor (1995),106 Ohio App.3d 741, 747-749, 667 N.E.2d 60.
 {¶ 21} Consensual encounters occur when the police merely approach a person in a public place and engage the person in conversation, and the person remains free not to answer and to walk away. United States v.Mendenhall (1980), 446 U.S. 544, 553, 100 S.Ct. 1870, 1876,64 L.Ed.2d 497, 504-505. The encounter remains consensual even if the officer asks questions, requests to examine an individual's identification, and asks to search the person's belongings, provided that the officer does not convey that compliance is required. Florida v. Rodriguez (1984),469 U.S. 1, 4-6, 105 S.Ct. 308, 83 L.Ed.2d 165, 169-171; Florida v.Bostick (1991), 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389. "TheFourth Amendment guarantees are not *Page 8 
implicated in such an encounter unless the police officer has by either physical force or show of authority restrained the person's liberty so that a reasonable person would not feel free to decline the officer's requests or otherwise terminate the encounter." (Citations omitted)Taylor, 106 Ohio App.3d at 747-48.
 {¶ 22} An individual is subject to an investigatory detention when, in view of all the circumstances surrounding the incident, by means of physical force or show of authority, a reasonable person would have believed that he was not free to leave or is compelled to respond to questions. Mendenhall, 446 U.S. at 553; Terry, 392 U.S. at 16, 19. UnderTerry, police officers may briefly stop and/or temporarily detain individuals in order to investigate possible criminal activity if the officers have a reasonable, articulable suspicion that criminal activity may be afoot. State v. Martin, Montgomery App. No. 20270,2004-Ohio-2738, at ¶ 10, citing Terry, supra; State v. Molette, Montgomery App. No. 19694, 2003-Ohio-5965, at ¶ 10. "Reasonable suspicion entails some minimal level of objective justification for making a stop — that is, something more than an inchoate and unparticularized suspicion or `hunch,' but less than the level of suspicion required for probable cause." State v. Jones (1990),70 Ohio App.3d 554, 556-557, 591 N.E.2d 810, citing Terry, 392 U.S. at 27. We determine the existence of reasonable suspicion by evaluating the totality of the circumstances, considering those circumstances "through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." State v. Heard, Montgomery App. No. 19323, 2003-Ohio-1047, at ¶ 14, quoting State v. Andrews (1991),57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271; see State v. Bobo (1988),37 Ohio St.3d 177, 524 N.E.2d 489 (setting forth factors to consider in determining *Page 9 
whether a reasonable suspicion to make a stop exists).
 {¶ 23} The final category is a seizure that is the equivalent of an arrest. "A seizure is equivalent to an arrest when (1) there is an intent to arrest; (2) the seizure is made under real or pretended authority; (3) it is accompanied by an actual or constructive seizure or detention; and (4) it is so understood by the person arrested."Taylor, 106 Ohio App.3d at 749, citing State v. Barker (1978),53 Ohio St.2d 135, 372 N.E.2d 1324, at syllabus. An arrest must be based on probable cause.
 {¶ 24} Upon review of the record, we agree with the trial court that, prior to being placed in a cruiser, the encounter between Lewis and the police was a consensual encounter. Zimmerman and Velez did not activate the cruiser's lights or siren when it backed up to Lewis' property. The officers approached Lewis and the others and asked to speak with them about the dogs. Although the officers requested the men's identification, the officers did not indicate that compliance was required and Lewis' liberty was not restrained by physical force or a show of authority.
 {¶ 25} In this case, the consensual nature of the encounter is not altered by the fact that it occurred on the grassy area between the alley and Lewis' fence. Even assuming that the grassy area was Lewis' private property, the police may enter private property without such conduct constituting a search, provided that the officers restrict their movements to those areas generally made accessible to visitors, such as driveways, walkways, or similar passages. (Citations omitted) State v.Lungs, Montgomery App. No. 22704, 2008-Ohio-4928, ¶ 20; State v.Peterson, 173 Ohio App.3d 575, 879 N.E.2d 806, ¶ 17 ("The only areas of the curtilage where the officers may go are those impliedly open to the public"). *Page 10 
 {¶ 26} Here, the officers approached Lewis and his companions in the grassy area adjacent to the alley, which was being used for parking by Lewis and one of his visitors. The record thus reflects that the officers approached Lewis in an area that was generally accessible to visitors, and there is no evidence that, absent a warrant, the officers entered the fenced area or any other portion of the property that was not accessible to the public.
 {¶ 27} Next, Lewis asserts that "the search continued, without probable cause or a search warrant, during which the officers found more incriminating evidence which ultimately led to the search of Mr. Lewis' home." We presume that Lewis is referring to the evidence obtained from Lungs' van.
 {¶ 28} "It is fundamental that Fourth Amendment rights are personal in nature and may not be vicariously asserted. Rakas v. Illinois (1978),439 U.S. 128, 133-34, 99 S.Ct. 421, 58 L.Ed.2d 387. A person aggrieved by the introduction of evidence secured by an illegal search of a third person's premises or property has not suffered any infringement upon hisFourth Amendment rights. Id. at 134. Consequently, a person challenging the legality of a search bears the burden of proving that he has standing. State v. Williams (1995), 73 Ohio St.3d 153, 166,652 N.E.2d 721. The burden is met by establishing that the person has a legitimate expectation of privacy in the place searched that society is prepared to recognize as reasonable. Rakas, 439 U.S. at 143; Williams, 73 Ohio St.3d at 166." State v. Henderson, Montgomery App. No. 22062, 2008-Ohio-1160, ¶ 9.
 {¶ 29} The evidence at the suppression hearing established that Lungs owned the van, and Lewis disclaimed any ownership of the van or of the dogs inside the van *Page 11 
and outside his home. Consequently, Lewis had no expectation of privacy in the van, and he lacks standing to challenge the officers' search of the van. (We note that we concluded in Lungs' appeal that noFourth Amendment violation occurred when the officers looked into Lungs' open van and viewed the dogs and other items, which were openly visible.Lungs at ¶ 24.)
 {¶ 30} Lewis also asserts that his signed consent to search his vehicle was invalid because it was obtained while he was being unlawfully detained and it was not voluntarily given. The record does not support either of Lewis' contentions. By the time Lewis was detained, Officers Zimmerman and Velez had observed approximately 25 pitbulls in and around Lungs' van at Lewis' residence. Some of the dogs had visible scarring and a collar with a large ring, such as is used to condition dogs for dogfighting. Hypodermic syringes, weapons clips and bullets had been located in the van. Brasher had been at Lewis' home to purchase a dog from Lungs. Although Lewis denied any ownership of the dogs near the van, based on the totality of the circumstances, the officers had a reasonable, articulable suspicion that Lewis was involved with dogfighting such that they were justified in detaining Lewis while they investigated.
 {¶ 31} As for the search of his truck, Lewis was being lawfully detained when he consented to the search of his vehicle. Thus, Lewis' consent to search his truck was not invalid per se. In addition, Zimmerman testified that he asked Lewis if he could search his truck and Lewis verbally agreed. Nothing in the record suggests that Lewis' consent was coerced or otherwise given involuntarily.
 {¶ 32} Because we have determined that the officers lawfully approached Lewis, looked into Lungs' van, detained Lewis, and searched Lewis' truck, the evidence *Page 12 
obtained during the investigation was properly included in the affidavit in support of the search warrant for Lewis' home.
 {¶ 33} The assignment of error is overruled.
 III {¶ 34} Having overruled the assignment of error, the judgment of the trial court will be affirmed.
BROGAN, J. and FAIN, J., concur.
Copies mailed to:
Michele D. Phipps Jay A. Adams Hon. Jeffrey E. Froelich *Page 1