[Cite as *State v. Collier*, 2019-Ohio-3197.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2018-CA-104 |
| | : | |
| v. | : | Trial Court Case No. 2017-CR-423 |
| | : | |
| DONALD COLLIER II | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 9th day of August, 2019.

. . . . . . . . . .

JOHN M. LINTZ, Atty. Reg. No. 0097715, Clark County Prosecutor's Office, Appellate Division, 50 E. Columbia Street, Suite 449, Springfield, Ohio 45502
    Attorney for Plaintiff-Appellee

CHRIS BECK, Atty. Reg. No. 0081844, 1370 N. Fairfield Road, Suite C, Beavercreek, Ohio 45432
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FROELICH, J.

{¶ 1} Donald Collier II was convicted after a jury trial in the Clark County Court of Common Pleas of trafficking in cocaine, a felony of the second degree, and aggravated trafficking in drugs, a felony of the fourth degree. Collier appeals from his convictions, claiming that the trial court erred in denying his pretrial motion to suppress. For the following reasons, the trial court's judgment will be reversed, and the case will be remanded for further proceedings.

## I. Facts and Procedural History

{¶ 2} Springfield Police Officer Kevin Hoying testified for the State at the suppression hearing. Collier called Officer Phil Belcher as a witness. The defense also offered five exhibits: (1) K-9 deployment report, (2) probable cause affidavit, (3) dispatch report, (4) a recording of the 911 call, and (5) a recording of the dispatch. The evidence at the suppression hearing established the following facts.

{¶ 3} At approximately 12:57 p.m. on March 27, 2017, an unidentified woman called 911, stating that she was at a Wendy's fast-food restaurant on East Main Street and there was "suspicious activity." She told the dispatcher that there was a "guy parked out in a red car, and he's had like three people show up and go straight to his car." Upon further questioning by the dispatcher, the woman stated that the car was a two-door Camry, that the driver was "black," and that the car had been there for "maybe 10 [or] 15 minutes." The caller responded "yes" to the question of whether she believed there was possible drug activity. There was no indication that the caller was a Wendy's employee, and she did not provide any information to identify herself. (*See* Exhibit D, 911 call.)

{¶ 4} Officer Hoying had been a police officer with the City of Springfield for more

than 11 years; he had been a certified K-9 officer for more than four of those years. His K-9 partner was Spike. Officer Hoying was on patrol in a marked cruiser with Spike when he was dispatched to the Wendy's restaurant. The dispatcher told Hoying to "check for the red Toyota Camry on the lot" with a "black male driver, possibly dealing out of this car." The dispatcher reported that the caller had said the car had been there for "about 15 minutes and there's a lot of foot traffic to this car."

{¶ 5} Officer Hoying testified that he had conducted many traffic stops and conducted drug search warrants in the area of Springfield where the Wendy's was located. However, he did not consider that particular street necessarily to be a high crime area. He stated, "[I]t's high in drug activity coming and going[,] but there's a lot of good business going on there too. It's just a high traffic area[.]" Hoying later testified that he had made more drug arrests near the Wendy's than in some areas of Springfield, but he had made substantially more drug arrests in other areas of Springfield than near the Wendy's.

{¶ 6} When Officer Hoying arrived at the Wendy's, he observed a red Camry with a black male in the driver's seat; Hoying identified the driver as Collier at the suppression hearing. Hoying also observed another male in the front passenger seat. Hoying did not know either individual, and he had not previously arrested either of them for any kind of illegal activity. The Camry was legally parked. Hoying saw other cars in the drive-thru lane and customers in the restaurant, but he did not see any foot traffic to or from Collier's car; Hoying testified that "it was pretty empty where [Collier] was parked." Officer Hoying pulled up behind the Camry and parked. Hoying testified that the Camry could not back out without hitting the cruiser.

{¶ 7} Officer Hoying exited his cruiser and approached the vehicle on the driver's side. He noticed that the passenger had a Wendy's Frosty dessert that was partially eaten and had melted, and Hoying concluded from this that the individuals had been sitting in the car for a while. Hoying testified that Collier acted "extremely nervous," sweating, and was not "talking real clearly as if he was trying to figure out * * * what to say to me as to why he was there." Officer Hoying testified that he "immediately saw a large bulge in his [Collier's] waistband or groin area." Based on his experience, Hoying had a "guess" or "suspicion" of what was located in Collier's pants, but he did not know what it was. Hoying did not see anything illegal in the Camry.

{¶ 8} Officer Hoying told Collier that he was there to investigate him and asked about the foot traffic. According to Hoying's probable cause affidavit, Collier told Hoying that several of his (Collier's) friends saw him sitting there and walked over to say hello. Hoying testified at the hearing that Collier responded that "cars driving by would see him sitting there and would pull in and get out and go approach him to say hello for a second, get back in the car, and leave."

{¶ 9} Approximately three minutes after the dispatch, Officer Hoying ran Collier's and his passenger's information through dispatch. Dispatch informed Hoying that neither man had any warrants, and that the Camry was properly registered. The dispatcher provided additional information regarding the passenger's criminal history.

{¶ 10} Shortly after Hoying's arrival, two other officers, Officers Phil Belcher and Jason Phillips, arrived at the scene in another marked cruiser; the officers parked behind Hoying's cruiser, further blocking Collier's car from the leaving the parking lot.[1] Officer

---

[1] The exact timing of Officers Belcher and Phillip's arrival in relation to Officer Hoying's

Belcher testified that he also did not see any foot traffic going to or from the Camry. Officer Belcher walked up to Hoying, and Officer Phillips walked to the front passenger side of the Camry. Belcher stated that Collier was acting "nervous, kind of anxious, voice was a little crackly, talking low." Belcher did not see Collier doing anything else out of the ordinary.

{¶ 11} Once the other officers were there, Hoying instructed Collier to exit the vehicle and told Collier that he (Hoying) was going to run his K-9 around the vehicle. Officer Phillips asked the passenger to exit the vehicle. Officer Belcher testified that Hoying had his hand on Collier's belt to "secure" Collier until Hoying passed Collier off to him (Officer Belcher). Officer Belcher then had his hand on Collier's belt as they walked to the rear of Collier's vehicle. The officers did not handcuff Collier, but Belcher had Collier stand with his hands on the trunk and his feet spread. Officer Belcher then walked Collier toward the cruisers so that the K-9 could walk around the Camry.

{¶ 12} Officer Hoying walked Spike around the Camry for a free air sniff; Spike alerted on the car's driver's door handle. Hoying testified that the alert indicated that drugs were in the vehicle or had recently been in the vehicle; he stated that "recently" could be "five minutes before or it could have been a week or more" prior to the alert.

{¶ 13} After the alert, Officer Hoying approached Collier due to the large bulk in his pants, patted him down, and felt something hard in Collier's waistband. Collier stated that it was "his junk." Hoying responded that it was not, and asked if it was a scale.

---

arrival is somewhat unclear. Officer Hoying's reports suggest that the other officers arrived contemporaneously with Hoying's arrival. Officer Belcher testified that Officer Hoying had arrived shortly before he and Phillips did, and that Officer Hoying was beside the driver's side of Collier's vehicle when he (Belcher) got out of his cruiser. Belcher stated that there was "a brief amount of time" between Hoying's arrival and his.

Collier said no. Hoying put on gloves and retrieved the item from Collier's pants; it was a scale. Collier also removed suspected crack cocaine from Collier's waistband.

{¶ 14} Hoying then returned to the Camry and searched it. He located rubber gloves, ripped plastic bags (which Hoying described as "bite and twist" drug packaging), and a "beanie hat" with $20. Hoying testified that the drugs were sent to BCI for analysis, and a portion tested positive for fentanyl.[2]

{¶ 15} On July 31, 2017, Collier was indicted for trafficking in cocaine (greater than or equal to 20 grams, but less than 27 grams, a second-degree felony), possession of cocaine (greater than or equal to 20 grams, but less than 27 grams, a second-degree felony), aggravated trafficking in drugs (less than the bulk amount, a fourth-degree felony), and aggravated possession of drugs (less than the bulk amount, a fifth-degree felony).[3] Collier subsequently moved to suppress the drugs. The trial court conducted the suppression hearing on January 17 and February 12, 2018, during which Officers Hoying and Belcher testified. Transcripts of the suppression hearing were prepared, and the parties filed post-hearing memoranda.

{¶ 16} On May 22, 2018, the trial court overruled the motion to suppress. The trial court found that the evidence was "sufficient to show that under the totality of the circumstances the officer had a reasonable articulable suspicion of drug activity justifying

---

[2] Officer Hoying did not provide additional details about the drugs at the suppression hearing. The BCI report submitted at Collier's subsequent trial indicated that four envelopes of unknown substances were submitted for analysis; three of the substances were found to contain cocaine and one was determined to be furanyl fentanyl.

[3] The indictment did not specify the Schedule I controlled substance that was the subject of the aggravated trafficking/possession of drugs charges. However, the evidence at trial indicated that the substance was furanyl fentanyl.

the removal of the defendant from the car and a free air sniff by the K-9. As a result of the positive indication by the K-9 of drugs having been in the car, the officer had probable cause to search the car and the defendant."

{¶ 17} The matter proceeded to a jury trial, at the conclusion of which the jury found Collier guilty of all four offenses. The court ordered a presentence investigation. At sentencing, the trial court merged the trafficking counts with the possession counts, and the State elected to proceed on the trafficking counts. The court ordered Collier to serve six years in prison for trafficking in cocaine (Count One) and 17 months for aggravated trafficking in drugs (Count Three), with the sentence for Count Three to be served consecutively to the sentence for Count One. The trial court imposed a mandatory fine of $7,500 for Count One and $2,500 for Count Three, and ordered Collier to pay court costs. The court suspended Collier's driver's license for five years.

{¶ 18} Collier appeals from his convictions. His sole assignment of error claims that the trial court "erred in finding that the police did not violate the Fourth Amendment when it denied Appellant's motion to suppress."

## II. Waiver of Issue for Appeal

{¶ 19} On appeal, Collier argues that, at the time the police parked behind Collier's vehicle, they lacked a reasonable and articulable suspicion of criminal activity. He emphasizes that the dispatch was based on an anonymous caller, which did not include adequate indicia of reliability to allow the officers to seize and subsequently search him. Collier notes that, although a Camry was located at the Wendy's as reported, the vehicle was legally parked, Hoying testified that it was not unusual for person to be in his or her car at the Wendy's at lunchtime, and Hoying saw no foot traffic to or from the Camry.

{¶ 20} In response, the State first argues that the issue raised by Collier on appeal was not raised before the trial court. The State notes that Collier specifically argued in his motion to suppress that the officers lacked a reasonable articulable suspicion of criminal activity to order him from his vehicle and lacked a reasonable suspicion that he was armed and dangerous to justify as search of Collier's person and vehicle. The State asserts that the "issues raised at suppression and on appeal are at best tangentially related," and the State would have had a chance to introduce additional evidence if the issue had been raised below. The State thus argues that Collier waived his argument regarding the tip for appeal.

{¶ 21} Under Crim.R. 47, a motion, including a motion to suppress evidence, must "state with particularity the grounds upon which it is made and shall set forth the relief or order sought. It shall be supported by a memorandum containing citations of authority, and may also be supported by an affidavit."

{¶ 22} If a motion to suppress fails to state a particular basis for relief, that issue is waived and cannot be argued on appeal. *E.g., State v. Davis*, 2017-Ohio-5613, 94 N.E.3d 194, ¶ 21 (2d Dist.); *State v. Cullins*, 2d Dist. Montgomery No. 23017, 2009-Ohio-6136, ¶ 10. As stated by the Supreme Court of Ohio with respect to a motion to suppress evidence obtained from a warrantless search:

The prosecutor must know the grounds of the challenge in order to prepare his case, and the court must know the grounds of the challenge in order to rule on evidentiary issues at the hearing and properly dispose of the merits. Therefore, the defendant must make clear the grounds upon which he challenges the submission of evidence pursuant to a warrantless search or

seizure. Failure on the part of the defendant to adequately raise the basis of his challenge constitutes a waiver of that issue on appeal.

(Citations omitted.) *Xenia v. Wallace*, 37 Ohio St.3d 216, 218, 524 N.E.2d 889 (1988).

{¶ 23} Collier's motion to suppress, filed on October 24, 2017, asked the trial court to suppress all items seized from his person and from his vehicle. He asserted that (1) "there was no reasonable, articulable suspicion that defendant was engaged in criminal activity such as would warrant stopping and/or detaining defendant," (2) "there was no reason to believe that defendant was armed and dangerous to justify search of person and/or search of the vehicle within which defendant was sitting," (3) "there was no warrant to search and no probable cause to arrest defendant, and (4) "there was no legal justification to search vehicle."

{¶ 24} In his supporting memorandum, Collier contended that the officers had no reasonable, articulable suspicion of criminal activity on defendant's part to justify the officers' order that he exit the car, the search of his person, or the search of the car. Collier further contended that the officer did not have reasonable suspicion that he was armed and dangerous to warrant ordering him from the car or searching his person and the car.

{¶ 25} Collier's motion to suppress satisfied Crim.R. 47's requirement that he articulate particular grounds for the suppression of the evidence against him. Those grounds included an assertion that the officers lacked a reasonable and articulable suspicion of criminal activity to warrant an investigatory detention. The State was on notice, prior to the hearing, that it would be required to establish that the officers' encounter with Collier was lawful. We find the State's argument that the issues raised

on appeal "are at best tangentially related" to the issues raised in the motion to suppress to be unsupported by the record.

{¶ 26} Moreover, Officer Hoying was thoroughly questioned by both parties about the entire sequence of the investigation, including questions about the wording of the 911 call, whether the caller was anonymous, the wording of the dispatch, Officer Hoying's observations upon arriving at the Wendy's, the position of Hoying's cruiser in relation to Collier's vehicle, Hoying's observations and questions to Collier upon approaching Collier's vehicle, when Collier was ordered to exit his vehicle, the K-9 sniff, the search of Collier's person, and the search of Collier's vehicle. Officer Belcher was also questioned about his observations upon arriving at the Wendy's, how he parked his cruiser, what he observed upon joining Officer Hoying at Collier's vehicle, and how Collier was physically controlled upon exiting the vehicle. Collier's exhibits included, among other items, recordings of the 911 call and of the dispatch. The suppression hearing proceedings thus reflect that the parties considered the totality of encounter at the Wendy's – from the 911 call to Collier's arrest – to have been raised by Collier's motion to suppress.

{¶ 27} The State filed a post-hearing memorandum on March 9, 2017. The State's memorandum included statements of the law regarding when police may conduct an investigative stop, when police have a right to conduct a pat-down search, when probable cause exists for an arrest, and that a canine alert "provides the probable cause necessary for searches and seizures." After summarizing the evidence at the suppression hearing, the State asserted that "Officer Hoying had a reasonable and articulable suspicion to conduct a pat-down of the defendant due to the nature of the call, nervousness of the defendant, and the particular bulge coming from his groin area.

Furthermore, he had probable cause to arrest the defendant based upon the canine indicating on the vehicle. * * * The officer had sufficient indicia of probable cause to conduct the arrest upon the canine indicating. Lastly, searching the vehicle would have further allowed the officer to search the defendant incident to arrest based upon the canine indicating, locating rubber gloves, and locating bite and twist bags." The State did not discuss whether the officers had reasonable articulable suspicion to initiate an investigatory detention and when that detention began.

{¶ 28} Collier's post-hearing memoranda were filed a week later (Doc. #22, 23). Collier's initial memorandum identified two issues for the trial court to focus on: (1) whether Hoying had a reasonable articulable suspicion that Collier was engaged in criminal activity to justify the officer's ordering him out of his car, and (2) whether the dog's alert on the car justified a search of Collier's person for drugs. Before addressing these two issues, Collier provided a statement of law regarding the different types of police-citizen encounters, when a *Terry* stop occurs, and when officers can conduct limited protective searches. Collier argued:

> In this case, two police cruisers pulled up behind the car in which defendant was sitting, preventing defendant from leaving the parking lot; three uniformed officers approached the car, two on the driver side and one on the passenger side; Hoying opened the car door and ordered defendant to get out of the car; Hoying grabbed defendant by the belt or waistband as defendant exited the car, and passed defendant off to a second officer; the second officer grabbed defendant by the belt and escorted defendant to the rear of the vehicle, and then had defendant bend over, spread his legs and

place his hands on the trunk of the car. Defendant was then placed in the back seat of a police cruiser while Hoying ran his dog around the car from which defendant had been removed. This was not a consensual encounter. Defendant's liberty was clearly restrained by show of force or authority. It was at the very least an investigatory detention, if not an actual arrest.

{¶ 29} Although Collier directed the trial court to particular issues in his post-hearing memoranda, his memoranda cannot be read to abandon a more general argument that the officers lacked a reasonable and articulable suspicion to justify an investigatory detention. Accordingly, we will address the merits of Collier's argument on appeal.

### III. Validity of the *Terry* Stop

{¶ 30} In ruling on a motion to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994); *State v. Knisley*, 2d Dist. Montgomery No. 22897, 2010-Ohio-116, ¶ 30. Accordingly, when we review suppression decisions, we must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Retherford* at 592. "Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id*.

### A. Timing of Investigative Detention

{¶ 31} The Fourth Amendment to the United States Constitution protects

individuals from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Under *Terry*, police officers may briefly stop and/or temporarily detain individuals in order to investigate possible criminal activity if the officers have a reasonable, articulable suspicion that criminal activity may be afoot. *Id.*; *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 7-8. "An individual is subject to an investigatory detention when, in view of all the circumstances surrounding the incident, by means of physical force or show of authority, a reasonable person would have believed that he was not free to leave or [was] compelled to respond to questions." *State v. Lewis*, 2d Dist. Montgomery No. 22726, 2009-Ohio-158, ¶ 22, citing *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) and *Terry* at 19. Fourth Amendment protections are implicated in an investigatory detention, i.e., a *Terry* stop.

{¶ 32} A pivotal issue in this case is when the investigatory detention of Collier began. We conclude that it began when Officer Hoying parked behind Collier's legally parked vehicle such that Collier was unable to drive away without hitting Hoying's cruiser.

{¶ 33} A "seizure" requires either "some application of physical force" or "a show of authority to which the subject yields." *State v. Franklin*, 2d Dist. Montgomery No. 15875, 1997 WL 476693, *2 (Aug. 22, 1997), citing *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991); *State v. Thomas*, 2017-Ohio-8606, 100 N.E.3d 899, ¶ 11 (2d Dist.). Absent more, an officer does not initiate an investigatory detention merely by approaching an individual seated in a legally parked car. *See, e.g., Thomas* (officer did not detain defendants when he drove up to defendant's vehicle without lights, sirens, or commands and parked without blocking in defendant's vehicle); *State v. Carter*,

2d Dist. Montgomery No. 19833, 2004-Ohio-454, ¶ 19-20 (an officer's act of pulling into a parking lot, stopping behind a defendant's parked car without blocking it in, illuminating the vehicle with a spotlight, and approaching to ask questions did not constitute a *Terry* stop); *State v. Lopez*, 2d Dist. Greene No. 94-CA-21, 1994 WL 527670, *3 (Sept. 28, 1994) (merely approaching individuals seated in a parked car does not constitute a seizure, particularly when the vehicle is parked in a public parking lot).

**{¶ 34}** However, "[c]ourts have generally held that, if an officer positions his cruiser so that a person cannot exit a parking lot without asking the officer to move, the officer has exhibited a show of authority constituting a seizure." *State v. Bergk*, 5th Dist. Fairfield No. 16-CA-45, 2017-Ohio-8210, ¶ 19, citing *State v. Wallace*, 145 Ohio App.3d 116, 122-23, 761 N.E.2d 1143 (6th Dist. 2001) and *State v. Inabnitt*, 76 Ohio App.3d 586, 589-90, 602 N.E.2d 740 (2d Dist.1991); *see also, e.g., State v. Curtis*, 193 Ohio App.3d 121, 2011-Ohio-1277, 951 N.E.2d 131 (2d Dist.); *State v. Maitland*, 9th Dist. Summit No. 25823, 2011-Ohio-6244, ¶ 6; *State v. Cookson*, 4th Dist. Washington No. 00CA53, 2001 WL 1155710, *4 (Sept. 25, 2001). As we stated in *Inabnitt*:

> One whose vehicle is blocked by a police cruiser from free movement and who is under questioning by a uniformed officer cannot "feel free" to get into his car and leave. His detention constitutes a "seizure" within the meaning of the Fourth Amendment. However, the seizure was no greater than that involved in an "investigative" stop, which is permitted when an officer possesses reasonable and articulable suspicion that a crime may have been committed.

*Inabnitt* at 589-590, citing *Terry*.

{¶ 35} In this case, Officer Hoying testified that, upon arriving at the Wendy's restaurant, he parked behind Collier's vehicle, which was legally parked. Hoying testified that the Camry could not back out, because it would have hit the cruiser. When asked if "the Camry was blocked from leaving the parking lot if the driver chose to do so," Hoying responded, "Correct." In addition, Hoying testified that, when Officers Belcher and Phillips arrived, they pulled up behind his cruiser, further blocking Collier's vehicle from leaving the parking lot. Hoying approached Collier on the driver's side of the vehicle, and Officer Belcher soon joined Officer Hoying; Officer Phillips went to the passenger side of the Camry. Officer Hoying's action of parking his cruiser behind Collier's legally parked Camry such that Collier could not leave without hitting Hoying's cruiser was a show of authority sufficient to initiate an investigatory detention.

**B. Reasonable Articulable Suspicion**

{¶ 36} Having concluded that the investigatory stop began when Hoying parked behind Collier's vehicle, the next question is whether Officer Hoying had a reasonable suspicion of criminal activity to initiate the investigatory stop. We conclude he did not.

{¶ 37} We determine the existence of reasonable suspicion by evaluating the totality of the circumstances, considering those circumstances "through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Heard*, 2d Dist. Montgomery No. 19323, 2003-Ohio-1047, ¶ 14, quoting *State v. Andrews*, 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991). The officer must have more than an inchoate hunch or suspicion to justify an investigatory stop. *State v. Belvin*, 2d Dist. Montgomery No. 25987, 2014-Ohio-3634, ¶ 8.

{¶ 38} "[If] an officer making an investigative stop relies solely upon a dispatch, the

State must demonstrate * * * that the facts precipitating the dispatch justified a reasonable suspicion of criminal activity." (Emphasis omitted.) *Maumee v. Weisner*, 87 Ohio St.3d 295, 298, 720 N.E.2d 507 (1999); *Maitland,* 9th Dist. Summit No. 25823, 2011-Ohio-6244, at ¶ 7.

> Whether a telephone tip alone can create reasonable suspicion justifying an investigative stop depends on its indicia of reliability. *Maumee v. Weisner*, 87 Ohio St.3d 295, 299, 720 N.E.2d 507 (1999). "Factors considered 'highly relevant in determining the value of [the informant's] report' are the informant's veracity, reliability, and basis of knowledge." *Id.* (quoting *Alabama v. White*, 496 U.S. 325, 328, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990)).

*Maitland* at ¶ 8.

{¶ 39} "Courts have generally recognized three categories of informants: (1) the identified citizen informant, (2) the known informant, i.e., someone from the criminal world who has a history of providing reliable tips, and (3) the anonymous informant." *State v. Jordan*, 104 Ohio St.3d 21, 2004-Ohio-6085, 817 N.E.2d 864, ¶ 36, citing *Maumee* at 300. "[A] tip from an identified citizen informant who is a victim or witnesses a crime is presumed reliable, particularly if the citizen relates his or her basis of knowledge." *State v. Gress*, 2d Dist. Montgomery No. 16899, 1998 WL 321014, *2 (June 19, 1998); *State v. Keith*, 2016-Ohio-1263, 62 N.E.3d 649, ¶ 30 (2d Dist.).

{¶ 40} In contrast, an anonymous tip generally lacks the indicia of reliability necessary to justify a stop. *See Navarette v. California*, 572 U.S. 393, 134 S.Ct. 1683, 188 L.Ed.2d 680 (2014); *Florida v. J.L.*, 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254

(2000). In *J.L.*, the United States Supreme Court held that an anonymous tip that a person was carrying a gun was not, without more, sufficient to justify a police officer's stop and frisk of that person. *Id.* at 271. In so holding, the Supreme Court expressly rejected the government's assertion that the tip was reliable because the description of the suspect's visible attributes proved to be correct, i.e., that there really was a young male of a particular race wearing a plaid shirt at the bus stop. *Id.* at 271-272. The Court stated:

> An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.

*Id.* at 272.

{¶ 41} In *Navarette*, the Supreme Court concluded that a motorist's 911 call was sufficiently reliable to justify a traffic stop of a pickup truck that reportedly ran the caller's vehicle off the road. Addressing the reliability of the tip, the court emphasized that (1) the caller identified the specific vehicle, thus "necessarily claim[ing] eyewitness knowledge of the alleged dangerous driving," (2) the timeline of events from call to stop of the vehicle indicating that the caller reported the incident soon after she was run off the road, and (3) the fact that the caller used the 911 emergency system, which "has some features that allow for identifying and tracing callers." *Id.* at 399-401. The Court further concluded

that the tip created a reasonable suspicion of an ongoing crime, such as drunk driving, as opposed to an isolated episode of past recklessness. The Court reasoned that the caller had reported "a specific and dangerous result of the driver's conduct," not just a minor infraction, and that it was reasonable to conclude that running another vehicle off the road was a significant indicator of drunk driving. *Id.* at 403. The Supreme Court recognized that this was a "close case," but concluded that, under the totality of the circumstances, the indicia of reliability were sufficient to provide the officer with reasonable suspicion that the pickup truck's driver had run another vehicle off the road, and thus the officer was justified in executing a traffic stop. *Id.* at 404.

{¶ 42} We have commented that "*Navarette* adds nothing to standards Ohio has long applied." *State v. Berry*, 2d Dist. Montgomery No. 28199, 2019-Ohio-1254, ¶ 43, citing *Maumee*, 87 Ohio St.3d 295, 296, 302-303, 720 N.E.2d 507 (1999) (telephone informant's tip of report of erratic driving, i.e., "weaving all over the road", was reliable enough to warrant investigative traffic stop on suspicion of driving under the influence).

{¶ 43} Here, an unknown woman reportedly at the Wendy's restaurant called 911 shortly before 1:00 p.m. to report that a red Toyota Camry had been parked in the Wendy's lot for 10 to 15 minutes, that the car was occupied by a black male in the driver's seat, and that "he's had like three people show up and go straight to his car." The caller stated that she thought the behavior was suspicious, and when asked if she was concerned about possible drug activity, the caller responded, "Yes."

{¶ 44} At the suppression hearing, Officer Hoying agreed that the caller was anonymous; the caller did not provide a name, Officer Hoying did not know who the caller was, and the officer never spoke to any individual who acknowledged calling the police.

The caller reported being located at the Wendy's; there was no indication whether the person was an employee of the Wendy's restaurant. Hoying expressly testified on cross-examination that, "because of an anonymous caller, I wanted to confirm what was being told to us by dispatch that there was something illegal afoot. So that is why I chose to run the dog around the car prior to looking more into the bulge." (Tr. at 46.)

{¶ 45} When Officer Hoying arrived at the Wendy's, he observed a red Camry with a black male in the driver's seat; another male was in the front passenger seat. The Camry was legally parked. Hoying testified that he saw other cars in the drive-thru lane and customers in the restaurant, but he did not see any foot traffic to or from Collier's car. In fact, Hoying testified that "it was pretty empty where [Collier] was parked." Officer Belcher similarly testified that, after arriving at the Wendy's parking lot, he did not see any foot traffic going to or from the Camry.

{¶ 46} Hoying's testimony and the 911 call indicate that the 911 caller was an anonymous caller, whose report is generally considered to be comparatively unreliable and would require independent corroboration. Officer Hoying acknowledged that there was nothing unusual about a car sitting in the parking lot for 15 minutes at Wendy's at 1:00 in the afternoon. When Hoying and the other officers arrived, the area where the Camry was parked was empty; the officers observed no one near the parked vehicle. The fact that a red Camry was located at the Wendy's restaurant, as reported, was sufficient to identify the vehicle at issue, but the officers observed nothing to indicate that the tip was reliable in its "assertion of illegality." *See J.L.*, 529 U.S. at 272, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000).

{¶ 47} Even assuming that the 911 caller were considered to be an identified

citizen informant, the information she provided during her 911 call was insufficient to create a reasonable articulable suspicion of criminal activity to justify the officers' immediate blocking of Collier's ability to leave and their initiating an investigative detention. The 911 caller reported that she saw three individuals approach a car that had been parked in the Wendy's parking lot for 10 or 15 minutes at lunchtime. Although the caller indicated that she was concerned about possible drug dealing, the caller provided no details of the individuals' interactions with the Camry's occupants. The caller did not report that she had observed one or more drug transactions or any other criminal or dangerous activity. When asked on cross-examination about whether it would be unusual for people to walk up to a car of someone they knew, Officer Hoying testified that he "thought it was strange that several, enough to receive a dispatch call, saw him [Collier] and approached him to talk to him." Hoying nevertheless acknowledged that "[i]t can happen."

{¶ 48} We conclude that the officers lacked a reasonable articulable suspicion of criminal activity to justify Collier's investigatory detention. Consequently, the trial court erred in denying Collier's motion to suppress the evidence seized as a result of the detention. Collier's assignment of error is sustained.

## IV. Conclusion

{¶ 49} The trial court's judgment will be reversed, and the case will be remanded for further proceedings.

. . . . . . . . . . . . .

WELBAUM, P.J., concurs:

{¶ 50} I agree with the analysis and result in the majority opinion. However, I

disagree with the statement in ¶ 40 of the opinion that "an anonymous tip generally lacks the indicia of reliability necessary to justify a stop." Rather, as the majority opinion also states, the indicia of reliability is governed by the totality of the circumstances test in *Navarette*, 572 U.S. 393, 134 S.Ct. 1683, 188 L.Ed.2d 680. In *Navarette*, the Supreme Court of the United States stressed that "under appropriate circumstances, an anonymous tip can demonstrate 'sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop.' " *Id*. at 397, quoting *Alabama v. White*, 496 U.S. 325, 327, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990).

{¶ 51} In considering this issue, the court described *White* and *J. L.*, 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), as "useful guides." *Id*. at 404. After fully analyzing these cases, the court concluded that:

Like *White*, this is a "close case." As in that case, the indicia of the 911 caller's reliability here are stronger than those in *J.L.*, where we held that a bare-bones tip was unreliable. Although the indicia present here are different from those we found sufficient in *White*, there is more than one way to demonstrate "a particularized and objective basis for suspecting the particular person stopped of criminal activity." Under the totality of the circumstances, we find the indicia of reliability in this case sufficient to provide the officer with reasonable suspicion that the driver of the reported vehicle had run another vehicle off the road. That made it reasonable under the circumstances for the officer to execute a traffic stop. * * *

(Citations omitted.) *Navarette* at 404.

{¶ 52} In all other respects, I agree with the majority that the trial court erred in

overruling the motion to suppress.

TUCKER, J., concurs:

{¶ 53} Although it is disconcerting that the timing of the stop was not a focus of the suppression hearing, I agree with the majority opinion's conclusion that a stop occurred when Hoying positioned his cruiser so that Collier could not drive his vehicle from the Wendy's parking lot. I also conclude, irrespective of the tipster's status, that the information the tipster provided was not sufficient to allow an investigative stop. Thus, I concur in the majority opinion's conclusion that the drugs at issue should have been suppressed.

Copies sent to:

John M. Lintz
Chris Beck
Hon. Richard J. O'Neill